1   MICHAEL D. HYNES (New York Bar No. 30634394 *admitted pro hac vice*)
    Michael.Hynes@us.dlapiper.com
2   **DLA PIPER LLP (US)**
    1251 Avenue of the Americas, 27th Floor
3   New York, NY 10020-1104
    Tel.:   212. 335.4500
4   Fax:    212 335.4501

5   LUPE R. LAGUNA (Bar No. 307156)
    Lupe.Laguna@us.dlapiper.com
6   **DLA PIPER LLP (US)**
    400 Capitol Mall, Suite 2400
7   Sacramento, CA 95814-4428
    Tel.:   916 930 3200
8   Fax:    916 930 3201

9   Attorneys for Defendant Katapult Group, Inc.

10

11                 **UNITED STATES DISTRICT COURT**

12                 **NORTHERN DISTRICT OF CALIFORNIA**

13                      **OAKLAND DIVISION**

14

15   ANDREW WEINSTEIN,                    CASE NO.  4:21-cv-05175-PJH

                   Plaintiff,             **REQUEST FOR JUDICIAL NOTICE IN**
16                                         **SUPPORT OF DEFENDANT KATAPULT**
                                           **GROUP, INC.'S MOTION TO COMPEL**
17   v.                                    **ARBITRATION AND DISMISS, OR**
                                           **ALTERNATIVELY STAY,**
18   KATAPULT GROUP, INC., a Delaware      **PROCEEDINGS**
     corporation; and DOES 1 through 10,
19   inclusive,                            Date:   September 23, 2021
                                           Time:  1:30 p.m.
20                 Defendants.             Dept.:  Courtroom 3 – 3rd Floor
                                                   Ronald V. Dellums Federal Building
21                                                 & U.S. Courthouse
                                           Judge:  Phyllis J. Hamilton
22
                                           Complaint Filed: April 12, 2021
23                                         Removal: July 6, 2021
                                           Trial Date: Not Set
24

25

26

27

28

1

## REQUEST FOR JUDICIAL NOTICE

2          Pursuant to Federal Rule of Evidence 201 and the incorporation by reference doctrine, *see,*

3   *e.g., Khoja v. Orexigen Therapeutics, Inc.,* 899 F.3d 988, 998 (9th Cir. 2018), Defendant Katapult

4   Group, Inc. ("Katapult") respectfully requests that the Court take judicial notice of the following

5   documents and consider them in connection with Katapult's Motion to Compel Arbitration:

6          **Exhibit A:**  Cognical, Inc.'s 2014 Stock Incentive Plan ("the Stock Option Plan"),

7   ¶attached hereto as Exhibit "**A**."

8          **Exhibit B:** JAMS Arbitration Rules & Procedures ("the JAMS Arbitration Rules").  A

9   true and correct copy of the JAMS Arbitration Rules, as publicly available at the following web

10  domain: https://www.jamsadr.com/rules-comprehensive-arbitration/, is attached hereto as Exhibit

11  "**B**."

12  **I.      THE COURT MAY CONSIDER THE STOCK OPTION PLAN UNDER THE
13          INCORPORATION BY REFERENCE DOCTRINE**

14         A court may take judicial notice of documents incorporated by reference into the complaint

15  even if the contents of those documents are not explicitly alleged.  *See Knievel v. ESPN*, 393 F.3d

16  1068, 1075 (9th Cir. 2005) (extending incorporation by reference doctrine to situations "in which

17  the plaintiff's claim depends on the contents of a document . . . even though the plaintiff does not

18  explicitly allege the contents of that document in the complaint").  In this way, "the incorporation-

19  by-reference doctrine 'prevents plaintiffs from selecting only portions of documents that support

20  their claims, while omitting portions of those very documents that weaken—or doom—their

21  claims.'"  *In Re Samsung Galaxy Smartphone Mktg. & Sales Pracs. Litig.*, No. 16-CV-06391-BLF,

22  2020 WL 7664461, at *4 (N.D. Cal. Dec. 24, 2020).

23         Here, the Stock Option Plan, attached hereto as Exhibit "A" is explicitly incorporated by

24  reference into the Advisor Agreement attached to Plaintiff's complaint.  (*See* Compl., Ex. A at ¶ I-

25  1.)  It is also central to Plaintiff's claims that he was improperly denied his stock options.  This is

26  because, as referenced in Plaintiff's complaint, those same options are subject to the "***terms of the***

27  ***Company's Stock Option Plan***[.]"  (Compl., Ex. A at ¶ I-1 (emphasis added).)  Plaintiff cannot be

28  permitted to omit the terms of the Stock Option Plan simply because it prohibits this judicial

1    proceeding and contains other terms that doom his claims.  *See Smartphone Mktg.*, 2020 WL

2    7664461, at *4 (N.D. Cal. Dec. 24, 2020).     Thus, the Stock Option Plan may, and should, be

3    properly considered in connection with Katapult's motion to compel arbitration.

4    **II.        JUDICIAL NOTICE OF THE JAM'S ARBITRATION RULES IS PROPER**

5              A court may take judicial notice of and consider undisputed facts in public records.  *Flaa v.*

6    *Hollywood Foreign Press Ass'n, et al.*, No. 2:20-cv-06974-SB, 2020 WL 8256191, at *2 (C.D. Cal.

7    Nov. 20, 2020).  A court may consider any matter that is subject to judicial notice, or incorporated

8    into, or relied upon by, the complaint. *See MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 503-04

9    (9th Cir. 1986); *see also United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) ("A court may

10   . . . consider certain materials—documents attached to the complaint, documents incorporated by

11   reference in the complaint, or matters of judicial notice— without converting the motion to dismiss

12   into a motion for summary judgment."). Judicial notice is appropriate for facts "not subject to

13   reasonable dispute" that are either generally known within the jurisdiction of the trial court, or "can

14   be accurately and readily determined from sources whose accuracy cannot reasonably be

15   questioned." Fed. R. Evid. 201(b).

16             Here, the JAMS Arbitration Rules are not subject to reasonable dispute.  "In general,

17   websites and their contents may be judicially noticed."  *Threshold Enterprises Ltd. v. Pressed*

18   *Juicery, Inc*., 2020 WL 1694361 (N.D. Cal. Apr. 7, 2020) (*citing Pac. Overlander, LLC v. Kauai*

19   *Overlander*, 2018 WL 3821070, at *3).  The JAMS Arbitration Rules attached hereto as Exhibit

20   "B"  are  publicly  available  at  the  following  web  domain:  https://www.jamsadr.com/rules-

21   comprehensive-arbitration/.   Thus, the Court may properly take judicial notice of the JAMS

22   Arbitration Rules.

23    Dated: July 27, 2021

24                                              DLA PIPER LLP (US)

25

26                                              By: */s/ Lupe R. Laguna*
                                                   MICHAEL D. HYNES
27                                                 LUPE R. LAGUNA
                                                   Attorneys for Defendant
28                                                 Katapult Group, Inc.

-3-

1

**PROOF OF SERVICE**

2
    I, Selena L. Paradee, declare:

3
    I am a citizen of the United States and employed in Sacramento, California.  I am over the age of eighteen years and not a party to the within-entitled action.  My business address is DLA

4
Piper LLP (US), 400 Capitol Mall Suite 2400, Sacramento, California 95814-4428.  On July 27, 2021, I served a copy of the within document(s):

5
        REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF

6
        DEFENDANT KATAPULT GROUP, INC.'S MOTION TO
        COMPEL ARBITRATION AND DISMISS, OR

7
        ALTERNATIVELY STAY, PROCEEDINGS

8
    ☒    (BY ELECTRONIC SERVICE VIA ECF FILING)  The document was served

9
        when electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.

10
    ☒    (FEDERAL)  I declare that I am employed in the office of a member of the bar of

11
        this court at whose direction the service was made.

12

13
    Arthur Fels
    Loeb & Loeb LLP

14
    10100 Santa Monica Blvd., Suite 2200
    Los Angeles, CA 90067

15
    Email: afels@loeb.com

16
    I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

17
    Executed on July 27, 2021, at Sacramento, California.

18

19
                _____
                Selena L. Paradee

20

21

22

23

24

25

26

27

28

-4-

# EXHIBIT A

**COGNICAL, INC.**

**2014 STOCK INCENTIVE PLAN**

SECTION 1.     <u>GENERAL PURPOSE OF THE PLAN; DEFINITIONS</u>

The name of the plan is the Cognical, Inc. 2014 Stock Incentive Plan (the "Plan"). The purpose of the Plan is to encourage and enable the officers, employees or directors of, and consultants (whether individuals or entities) to, Cognical, Inc. (including any successor entity, the "Company") and its Subsidiaries upon whose judgment, initiative and efforts the Company largely depends for the successful conduct of its business to acquire a proprietary interest in the Company. It is anticipated that providing such persons with a direct stake in the Company's welfare will assure a closer identification of their interests with those of the Company, thereby stimulating their efforts on the Company's behalf and strengthening their desire to remain with the Company.

The following terms shall be defined as set forth below:

*"Act"* means the U.S. Securities Act of 1933, as amended, and the rules and regulations thereunder.

"*Affiliate*" of any Person means a Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with the first mentioned Person. A Person shall be deemed to control another Person if such first Person possesses directly or indirectly the power to direct, or cause the direction of, the management and policies of the second Person, whether through the ownership of voting securities, by contract or otherwise.

*"Award"* or *"Awards,"* except where referring to a particular category of grant under the Plan, shall include Incentive Stock Options, Non-Qualified Stock Options, Restricted Stock Awards, Unrestricted Stock Awards or any combination of the foregoing.

"*Bankruptcy*" shall mean (i) the filing of a voluntary petition under any bankruptcy or insolvency law, or a petition for the appointment of a receiver or the making of an assignment for the benefit of creditors, with respect to the Holder, (ii) the Holder being subjected involuntarily to such a petition or assignment or to an attachment or other legal or equitable interest with respect to the Holder's assets, which involuntary petition or assignment or attachment is not discharged within 60 days after its date, or (iii) the Holder being subject to a transfer of its Issued Shares by operation of law, except by reason of death or divorce.

*"Board"* means the Board of Directors of the Company.

"*Cause*" means, except as otherwise defined in an Award agreement, dismissal as a result of (i) the commission of any act by a Grantee constituting financial dishonesty against the Company or its Subsidiaries (which act would be chargeable as a crime under applicable law); (ii) a Grantee's engaging in any other act of dishonesty, fraud, intentional misrepresentation, moral turpitude, illegality or harassment which, as determined in good faith by the Board, would: (A) materially adversely affect the business or the reputation of the Company or any of its Subsidiaries with their respective current or prospective customers, suppliers, lenders and/or other third parties with whom such entity does or might do business; or (B) expose the Company or any of its Subsidiaries to a risk of civil or criminal legal

damages, liabilities or penalties; (iii) the repeated failure by a Grantee to follow the lawful directives of the chief executive officer of the Company or any of its Subsidiaries or the Board; or (iv) any material misconduct, violation of the Company's or Subsidiaries' policies, or willful and deliberate non-performance of duty by the Grantee in connection with the business affairs of the Company or its Subsidiaries.

*"Code"* means the U.S. Internal Revenue Code of 1986, as amended, and any successor Code, and related rules, regulations and interpretations.

*"Committee"* means the Committee of the Board referred to in Section 2.

*"Effective Date"* means the date on which the Plan is approved by the stockholders of the Company, as set forth at the end of this Plan.

*"Eligible Person"* means any Person who is a full- or part-time officer, employee or director of, or a consultant (including an entity) to, the Company or any Subsidiary of the Company.

*"Exchange Act"* means the U.S. Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder.

"*Fair Market Value*" of a Share means (i) if the Shares are listed on the New York Stock Exchange, the closing price on the date of determination reported in the table entitled "New York Stock Exchange Composite Transactions" contained in *The Wall Street Journal* (or an equivalent successor table) (or, if no sale of Shares was reported for such date, on the most recent trading day prior to such date on which a sale of Shares was reported); (ii) if there is a public market for the Shares but they are not listed on the New York Stock Exchange, the closing sales price of the Shares on such other national exchange on which the Shares are principally traded, or as reported by the National Market System, or similar organization, as reported in the appropriate table or listing contained in *The Wall Street Journal*, or if no such quotations are available, the average of the high bid and low asked quotations in the over-the-counter market as reported by the National Quotation Bureau Incorporated or similar organizations; or (iii) in the event that there is no public market for the Shares, the fair market value of the Shares as determined (which determination shall be conclusive) in good faith by the Committee.

*"Grantee"* means any Person who has received an Award hereunder.

*"Holder"* means, with respect to an Award or any Issued Shares, the Grantee of the Award or Issued Shares and Permitted Transferee of such Award or Issued Shares. The term "Holder" shall not include any transferee of Issued Shares who is not a Permitted Transferee.

*"Incentive Stock Option"* means any Stock Option designated and qualified as an "incentive stock option" as defined in Section 422 of the Code.

*"Issued Shares"* means, collectively, all outstanding Shares issued pursuant to Restricted Stock Awards, all outstanding Shares issued pursuant to Unrestricted Stock Awards, and all Option Shares.

*"Non-Qualified Stock Option"* means any Stock Option that is not an Incentive Stock Option.

2

"*Option*" or "*Stock Option*" means any option to purchase Shares granted pursuant to Section 6.

"*Option Shares*" means outstanding Shares that were issued to a Holder upon the exercise of a Stock Option.

"*Parent*" means any corporation (other than the Company) in an unbroken chain of corporations ending with the Company if each of the corporations owns stock possessing 50 percent or more of the total combined voting power of all classes of stock in one of the other corporations in such chain.

"*Permitted Transferees*" shall mean Grantee's spouse, former spouse, children, stepchildren, brothers, sisters, nephews, nieces, grandchildren, parent, grandparent, mother-in-law, father-in-law, son-in-law or daughter-in-law, including adoptive relationships ("family members"), a trust in which the Grantee and the Grantee's family members have more than 50 percent of the beneficial interests or any other entity in which the Grantee and Grantee's family members own more than 50 percent of the voting interests. Upon the death of the Grantee, the term Permitted Transferees shall also include such deceased Grantee's estate, executives, administrators, personal representatives, heirs, legatees and distributees, as the case may be.

"*Person*" shall mean any individual, corporation, partnership (limited or general), limited liability company, limited liability partnership, association, trust, joint venture, unincorporated organization or any similar entity.

"*Repurchase Event*" means (i) a Termination of Service, (ii) the Holder's Bankruptcy, (iii) the consummation of a Sale Event, or (iv) a Restrictive Covenant Breach.

"*Restricted Stock Award*" means Awards granted pursuant to Section 7 and "*Restricted Stock*" means Shares granted pursuant to such Awards.

"*Restrictive Covenant Breach*" means a breach by the Grantee of an Award of any written non-competition covenant, non-solicitation covenant or confidentiality covenant owing to the Company, determined in each such case by the Board in its good faith judgment. The date of a Restrictive Covenant Breach shall be deemed to be the date upon which the Board or chief executive officer of the Company first learns of such Restrictive Covenant Breach.

"*Sale Event*" means the consummation of (i) the dissolution or liquidation of the Company, (ii) the sale of all or substantially all of the assets of the Company on a consolidated basis to an unrelated Person, (iii) a merger, reorganization or consolidation in which the outstanding Shares are converted into or exchanged for securities of the successor entity and the holders of the Company's outstanding voting power immediately prior to such transaction do not own at least a majority of the outstanding voting power of the successor entity immediately upon completion of such transaction, (iv) the sale of all or a majority of the outstanding Stock of the Company to an unrelated Person, or (v) any other transaction (but excluding any equity financing by the Company) in which the holders of the Company's outstanding voting power immediately prior to such transaction do not own at least a majority of the outstanding voting power of the Company or a successor entity immediately upon completion of the transaction.

"*Securities Act*" means the U.S. Securities Act of 1933, as amended, and the rules and regulations thereunder.

"*Shares*" means shares of Stock, and such other securities of the Company or successor entity as may be substituted for Shares pursuant to Section 4(a) hereof.

"*Stock*" means the Common Stock of the Company, subject to adjustments pursuant to Section 3.

"*Subsidiary*" means any corporation (other than the Company) in an unbroken chain of corporations beginning with the Company if each of the corporations other than the last corporation in the unbroken chain owns stock possessing 50 percent or more of the total combined voting power of all classes of stock in one of the other corporations in such chain.

"*Termination of Service*" means the termination of the Grantee's employment or service relationship with the Company and its Parents and Subsidiaries for any reason whatsoever, regardless of the circumstances thereof, and including, without limitation, upon death, disability, retirement, discharge or resignation for any reason, whether voluntarily or involuntarily. A Termination of Service will also occur if a Grantee's employment or service relationship with the Company and its Parents or Subsidiaries terminates as a result of one or more transactions causing the Grantee's employer (or the Person for whom such Grantee performs services) to cease to be a Subsidiary or Parent with respect to the Company. The following shall not constitute a Termination of Service: (i) a transfer to the employment or service of the Company from a Subsidiary or Parent or from the Company to a Subsidiary or Parent, or from one Subsidiary or Parent to another Subsidiary or Parent or (ii) an approved leave of absence for military service or sickness, or for any other purpose approved by the Committee, if the employee's right to re-employment is guaranteed either by a statute or by contract or under the policy pursuant to which the leave of absence was granted or if the Committee otherwise so provides in writing.

"*Unrestricted Stock Award*" means any Award granted pursuant to Section 8 and "*Unrestricted Stock*" means Shares granted pursuant to such Awards.

4

SECTION 2.     ADMINISTRATION OF PLAN; COMMITTEE AUTHORITY TO SELECT
               GRANTEES AND DETERMINE AWARDS

(a)     Administration of Plan.  The Plan shall be administered by the Board, or at the discretion of the Board, by a committee of the Board, composed of not less than two directors.  All references herein to the Committee shall be deemed to refer to the group then responsible for administration of the Plan at the relevant time (i.e., either the Board or a committee or committees of the Board, as applicable). Notwithstanding the foregoing, for purposes of Awards to non-employee directors, "Committee" shall mean the full Board.  In the event that the Company has a class of securities that is registered under Section 12 of the Exchange Act, the Committee shall be composed of two or more directors of the Company, each of whom shall qualify as a "non-employee director" under Rule 16b-3 promulgated by the Securities Exchange Commission under the Exchange Act.

(b)     Powers of Committee.  The Committee shall have the power and authority to grant Awards consistent with the terms of the Plan, including the power and authority:

(i)     to select the individuals and/or entities to whom Awards may from time to time be granted;

(ii)     to determine the time or times of grant, and the extent, if any, of Incentive Stock Options, Non-Qualified Stock Options, Restricted Stock Awards, Unrestricted Stock Awards or any combination of the foregoing, granted to any one or more Grantees;

(iii)     to determine the number of Shares to be covered by any Award;

(iv)     to determine and modify from time to time the terms and conditions, including restrictions, not inconsistent with the terms of the Plan, of any Award, which terms and conditions may differ among individual Awards and Grantees, and to approve the form of written instruments evidencing the Awards;

(v)     to amend, with the consent of the Grantee, the terms of any outstanding Award at any time, among other things, to change the exercise price of any Stock Option or to permit transfers of such Awards to the extent permitted by the Plan; *provided* that the consent of the Grantee shall not be required for any amendment (i) that does not adversely affect the rights of the Grantee, (ii) that is necessary or advisable (as determined by the Committee) to carry out the purpose of the Award as a result of any new applicable law or change in an existing applicable law, or (iii) to the extent the Plan or Award specifically permits amendment without consent;

(vi)     to accelerate at any time the exercisability or vesting of all or any portion of any Award;

(vii)     to impose any limitations on Awards granted under the Plan, including limitations on transfers, repurchase provisions and the like and to exercise repurchase rights or obligations;

Case 4:21-cv-05112-PJH   Document 14-1   Filed 01/12/10   Page 10 of 43

(viii)    subject to any restrictions applicable to Incentive Stock Options, to extend at any time the period in which Stock Options may be exercised;

(ix)    to appoint such agents as the Committee may deem necessary or advisable to administer the Plan; and

(x)    at any time to adopt, alter and repeal such rules, guidelines and practices for administration of the Plan and for its own acts and proceedings as it shall deem advisable; to interpret the terms and provisions of the Plan and any Award (including related written instruments); to make all determinations it deems advisable for the administration of the Plan; to decide all disputes arising in connection with the Plan; and to otherwise supervise the administration of the Plan.

All decisions and interpretations of the Committee shall be binding on all Persons, including the Company and Grantees.

(c)     Indemnification.  Neither the Board nor the Committee, nor any member of either or any delegatee thereof, shall be liable for any act, omission, interpretation, construction or determination made in good faith in connection with the Plan, and the members of the Board and the Committee (and any delegatee thereof) shall be entitled in all cases to indemnification and reimbursement by the Company in respect of any claim, loss, damage or expense (including, without limitation, reasonable attorneys' fees) arising or resulting therefrom to the fullest extent permitted by law and/or under any directors' and officers' liability insurance coverage which may be in effect from time to time.

SECTION 3.     STOCK ISSUABLE UNDER THE PLAN; CHANGES IN STOCK; SUBSTITUTION

(a)     Stock Issuable.  The maximum number of Shares reserved and available for issuance under the Plan shall be 1,539,290 Shares, subject to adjustment as provided in Section 3(b).  For purposes of this limitation, the Shares underlying any Awards that are forfeited, canceled, reacquired by the Company, satisfied without the issuance of Stock or otherwise terminated (other than by exercise) shall be added back to the Shares available for issuance under the Plan.  Subject to such overall limitation, Shares may be issued up to such maximum number pursuant to any type or types of Award.  The Shares available for issuance under the Plan may be authorized but unissued Shares or Shares reacquired by the Company and held in its treasury.

(b)     Changes in Stock.  Subject to Section 4 hereof, if, as a result of any reorganization, recapitalization, reclassification, stock dividend, stock split, reverse stock split spin-off or split-up or other similar change in the Company's capital stock, the outstanding Shares are increased or decreased or are exchanged for a different number or kind of Shares or other securities of the Company, or additional Shares or new or different Shares or other securities of the Company or other non-cash assets are distributed with respect to such Shares or other securities, or, if, as a result of any merger, consolidation or sale of all or substantially all of the assets of the Company, the outstanding Shares are converted into or exchanged for a different number or kind of securities of the Company or any successor entity (or a parent or subsidiary thereof), the Committee shall make an appropriate or proportionate adjustment in (i) the maximum number of Shares reserved for issuance under the Plan, (ii) the number and kind of Shares or other securities subject to any then outstanding Awards under the Plan, (iii) the repurchase price per Share subject to each outstanding Award, if any, and (iv) the exercise price and/or exchange price for each Share subject to any then outstanding Stock Options under the Plan, without changing the aggregate exercise price (i.e., the exercise price multiplied by the number of Stock Options) or the aggregate Fair Market Value of the Shares with respect to which such Stock Options remain exercisable.  Any such adjustment shall be made in accordance with the requirements of Treasury Regulation Sections 1.409A-1(b)(5)(v)(D) and 1.424-1(a)(5) as determined by the Committee in good-faith and any such adjustment by the Committee shall be final, binding and conclusive on all Persons.  No fractional Shares shall be issued under the Plan resulting from any such adjustment, but the Committee in its discretion may make a cash payment in lieu of fractional Shares.

The Committee may also adjust the number of Shares subject to outstanding Awards and the exercise price and the terms of outstanding Awards to take into consideration material changes in accounting practices or principles, extraordinary dividends, acquisitions or dispositions of stock or property or any other event if it is determined by the Committee that such adjustment is appropriate to avoid distortion in the operation of the Plan; *provided, however,* that no such adjustment shall be made if

7

it would constitute a modification, extension or renewal of a Stock Option within the meaning of Treasury Regulation Section 1.409A-1(b)(5)(v) or Section 1.424-1(e).

(c)        <u>Substitute Awards</u>. The Committee may grant Awards under the Plan in substitution for stock and stock based awards held by officers, employees or directors of, or consultants to, another corporation (the "employing corporation") in connection with a merger or consolidation of such employing corporation with the Company or a Subsidiary or upon such employer corporation becoming a Subsidiary hereunder in connection with a merger, consolidation, or stock purchase of such employer corporation or its parent corporation by the Company or any Subsidiary or upon such officer, employee or director of, or consultant to, such employer corporation in connection with an acquisition property of the employing corporation by the Company or a Subsidiary. The Committee may direct that the substitute Awards be granted on such terms and subject to such conditions as the Committee considers appropriate in the circumstances; *provided, however,* that the terms of any substitute Option granted pursuant to this Section 3(c) must comply with the requirements of Code Section 409A and 424 such that any Options granted in substitution of incentive stock options within the meaning of Section 422 of the Code shall qualify as Incentive Stock Options and any other Options granted pursuant to this Section 3(c) in substitution of non-qualified options granted shall not cause the Grantee of such substitute Options to be subject to taxation under Code Section 409A with respect to such Options. Any substitute Awards granted under the Plan shall not count against the Share limitation set forth in Section 3(a).

SECTION 4.    <u>TREATMENT UPON SALE EVENT OR OTHER EXTRAORDINARY TRANSACTION</u>

8

(a)    <u>Options</u>.

(i)    In the case of and subject to the consummation of a Sale Event, the Committee shall have the right (but not the obligation) to accelerate the vesting with respect to any or all of the outstanding Options. Upon the consummation of a Sale Event, the Plan and all Options issued hereunder (both vested and unvested) shall terminate upon the effective time of any such Sale Event unless provision is made in connection with the Sale Event in the sole discretion of the parties thereto for the assumption or continuation of Options theretofore granted by the successor entity, or the substitution of such Options with new Options of the successor entity or parent thereof, with appropriate adjustment as to the number and kind of Shares and, if appropriate, the per Share exercise prices, as such parties shall agree (after taking into account any acceleration hereunder).

(ii)    In the event of the termination of the Plan and all Options issued hereunder pursuant to a Sale Event, each Holder of Options shall be permitted, within a specified period prior to the consummation of the Sale Event as determined by the Committee, to exercise all such Options that are then exercisable or that will become exercisable as of the effective time of the Sale Event; *provided, however,* that the exercise of any Options not exercisable prior to the Sale Event shall be conditioned upon the consummation of the Sale Event.

(iii)    Notwithstanding anything to the contrary in Section 4(a)(i), in the event of a Sale Event pursuant to which holders of the Stock of the Company immediately prior to the consummation of such Sale Event will receive upon consummation thereof, a cash payment for each Share surrendered in the Sale Event, the Company shall have the right, but not the obligation, to make or provide for a cash payment to the Grantees holding vested Options (including Options (if any) that vest as a result of such Sale Event) in exchange for the cancellation thereof, in an amount equal to the difference between (A) the value, as determined by the Committee, of the consideration payable per Share pursuant to the Sale Event (the "Sale Price") times the number of Shares subject to outstanding vested Options (to the extent then exercisable at prices not in excess of the Sale Price) and (B) the aggregate exercise price of all such outstanding vested Options.

(b)    <u>Option Shares and Restricted Stock Awards</u>. Unless otherwise provided in an Award agreement, in the case of and subject to the consummation of a Sale Event, Option Shares and Shares of Restricted Stock shall be subject to the repurchase right set forth in Section 9(c)(i) and 9(c)(ii), respectively.

(c)    <u>Unrestricted Stock Awards</u>. Unless otherwise provided herein or in an Award agreement, any Shares of Unrestricted Stock shall be treated in a Sale Event the same as all other Shares then outstanding.

SECTION 5.    <u>ELIGIBILITY</u>

The Committee may in its discretion grant Awards to any Person who is an Eligible Person at the time such Award is granted, whether or not such Person has previously received an Award.

9

SECTION 6.    <u>STOCK OPTIONS</u>

(a)    <u>Nature of Stock Options</u>.  A Stock Option is an Award entitling the Grantee to acquire, upon payment of the exercise price per Share, as determined by the Committee and set forth in the Option Agreement, Shares subject to such restrictions and conditions as the Committee may determine at the time of grant.  Conditions may be based on continuing employment (or other service relationship) and/or achievement of pre-established performance goals and objectives.  The grant of a Stock Option is contingent on the Grantee executing the Stock Option agreement.  The terms and conditions of each such agreement shall be determined by the Committee, and such terms and conditions may differ among individual Awards and Grantees.

Stock Options granted under the Plan may be either Incentive Stock Options or Non-Qualified Stock Options.  Incentive Stock Options may be granted only to employees of the Company or any Subsidiary.  To the extent that any Option is not designated as an Incentive Stock Option or does not qualify as an Incentive Stock Option, it shall be deemed a Non-Qualified Stock Option.

(b)    Grants of Stock Options.  The Committee in its discretion may grant Stock Options to any Person who is an Eligible Person on the date the Stock Option is granted.  Stock Options granted under the Plan shall be subject to the following terms and conditions and shall contain such additional terms and conditions, not inconsistent with the terms of the Plan, as the Committee shall deem desirable.  If the Committee so determines, Stock Options may be granted in lieu of cash compensation at the Grantee's advance written election delivered to the Company no later than the date specified by the Committee, subject to such terms and conditions as the Committee may establish.

(i)    Exercise Price.  The exercise price per Share of Stock covered by a Stock Option granted under the Plan shall be determined by the Committee at the time of grant but shall not be less than 100 percent of the Fair Market Value of a Share on the date of grant.  If an employee owns or is deemed to own (by reason of the attribution rules of Section 424(d) of the Code) more than 10 percent of the combined voting power of all classes of stock of the Company or any Parent or Subsidiary (a "Ten Percent Owner"), the exercise price per Share of Stock covered by any Incentive Stock Option granted to such employee shall be not less than 110 percent of the Fair Market Value of a Share on the grant date.

(ii)    Option Term.  The term of each Stock Option shall be fixed by the Committee, but no Stock Option shall be exercisable more than 10 years after the date the Stock Option is granted.  If an employee is a Ten Percent Owner on the grant date of an Incentive Stock Option granted to such employee, the term of such Incentive Stock Option shall be no more than five years from the date of grant.

(iii)    Exercisability; Rights of a Stockholder.  Stock Options shall become exercisable at such time or times, whether or not in installments, as shall be determined by the Committee and set forth in the Stock Option agreement.  The Committee may at any time accelerate the exercisability of all or any portion of any Stock Option.  A Grantee shall have the rights of a stockholder only as to Shares acquired upon the exercise of a Stock Option and not as to unexercised Stock Options.  A Grantee shall not be deemed to have acquired any such Shares unless and until a Stock Option shall have been exercised pursuant to the terms hereof, the Company shall have issued and delivered the Shares to the Grantee, and the Grantee's name shall have been entered on the books of the Company as a stockholder.

(iv)    Method of Exercise.  Stock Options may be exercised in whole or in part, by giving written notice of exercise to the Company, specifying the number of Shares to be purchased.  Payment of the purchase price may be made by one or more of the following methods or as otherwise provided by the Committee:

(A)    in cash, by certified or bank check or other instrument acceptable to the Committee in U.S. funds payable to the order of the Company in an amount equal to the applicable exercise price for each Option Share purchased;

(B)    by the Grantee delivering to the Company a promissory note if the Board has expressly authorized the loan of funds to the Grantee for the purpose of enabling or assisting the Grantee to effect the exercise of his or her Stock Option; provided that at least so much of the exercise price as represents the par value of the Stock shall be paid other than with a promissory note if otherwise required by state law; or

11

(C)     if permitted by the Committee, through the delivery (or attestation to the ownership) of Shares beneficially owned by the Grantee which are not then subject to restrictions under any Company plan.  Such surrendered Shares shall be valued at Fair Market Value on the exercise date.

Payment instruments will be received subject to collection.  No certificates for Shares so purchased will be issued to the Grantee until the Company has completed all steps required by law to be taken in connection with the issuance and sale of the Shares, including, without limitation, (i) receipt of a representation from the Grantee at the time of exercise of the Option that the Grantee is purchasing the Shares for the Grantee's own account and not with a view to any sale or distribution thereof, (ii) the legending of any certificate representing the Shares to evidence the foregoing representations and restrictions, and (iii) obtaining from Grantee payment or provision for all withholding taxes due as a result of the exercise of the Option.  The delivery of certificates representing the Shares to be purchased pursuant to the exercise of a Stock Option will be contingent upon receipt from the Grantee (or a purchaser acting in his stead in accordance with the provisions of the Stock Option) by the Company of the full purchase price for such Shares and the fulfillment of any other requirements contained in the Option Award agreement or applicable provisions of laws.  In the event a Grantee chooses to pay the purchase price by previously owned Shares through the attestation method, the number of Shares transferred to the Grantee upon the exercise of the Stock Option shall be net of the number of Shares attested to.

12

(c)     Annual Limit on Incentive Stock Options.  To the extent required for "incentive stock option" treatment under Section 422 of the Code, the aggregate Fair Market Value (determined as of the time of grant) of the Shares with respect to which Incentive Stock Options granted under this Plan or under any other plan maintained by the Company, any of its Parents or any of its Subsidiaries become exercisable for the first time by a Grantee during any calendar year shall not exceed $100,000.  To the extent that any Stock Option exceeds this limit, it shall constitute a Non-Qualified Stock Option.

(d)     Exercisability of Incentive Stock Option Following Termination of Employment.  An Incentive Stock Option granted hereunder shall not qualify for "incentive stock option" treatment under Section 422 of the Code unless the Grantee is an employee of the Company or a Parent or Subsidiary of the Company at all times during the period commencing on the date of grant and ending (i) on the day three (3) months prior to the date the Option is exercised, or (ii) if the Grantee is disabled (within the meaning of Section 22(e)(3) of the Code), on the day that is one year prior to the date the Option is exercised.

SECTION 7.     RESTRICTED STOCK AWARDS

(a)     Nature of Restricted Stock Awards.  A Restricted Stock Award is an Award pursuant to which the Company may, in its sole discretion, grant or sell, at such purchase price as determined by the Committee, in its sole discretion, Shares subject to such restrictions and conditions as the Committee may determine at the time of grant, which purchase price shall be payable in cash or other form of consideration acceptable to the Committee.  Conditions may be based on continuing employment (or other service relationship) and/or achievement of pre-established performance goals and objectives.  The grant of a Restricted Stock Award is contingent on the Grantee executing the Restricted Stock Award agreement.  The terms and conditions of each such agreement shall be determined by the Committee, and such terms and conditions may differ among individual Awards and Grantees.

(b)     Rights as a Stockholder.  Upon execution of a written instrument setting forth the Restricted Stock Award and payment of any applicable purchase price, a Grantee shall have the rights of a stockholder with respect to the voting of the Restricted Stock, subject to such conditions contained in the written instrument evidencing the Restricted Stock Award.

(c)     Vesting of Restricted Stock.  The Committee at the time of grant shall specify the date or dates and/or the attainment of preestablished performance goals, objectives and other conditions on which Restricted Stock shall become vested, subject to such further rights of the Company or its assigns as may be specified in the instrument evidencing the Restricted Stock Award.

(d)     Record Owner; Dividends.  The Holders of Restricted Stock shall be considered the record owners of and shall be entitled to vote the Shares of Restricted Stock if and to the extent such Shares are entitled to voting rights.  At the time of a grant of Restricted Stock, the Committee may require the payment of cash dividends thereon, if any, to be deferred and, if the Committee so determines, reinvested in additional Restricted Stock.  Stock dividends and deferred cash dividends issued with respect to Restricted Stock shall be subject to the same restrictions and other terms as apply to the Restricted Stock with respect to which such dividends are issued.  Notwithstanding the foregoing, the Company is under no obligation to declare any such dividends or to make any such distribution.

13

(e)     Effect of Forfeiture.  If Restricted Stock is forfeited pursuant to the terms of the Restricted Stock Award agreement and the Grantee did not pay for such Restricted Stock, such Shares shall be immediately transferred to the Company and cancelled upon the occurrence of a forfeiture event as set forth in the Restricted Stock Award agreement.  If Restricted Stock is not vested and the Grantee purchased such Restricted Stock from the Company, the Company or its assigns shall have the right and option to repurchase some or all of such non-vested Shares (as determined by the Company) upon the occurrence of an event causing the Grantee or Holder to forfeit his or her right to such Restricted Stock (the "Forfeiture Date") at a repurchase price equal to the lesser of (x) the amount paid by the Grantee for such Shares, or (y) the Fair Market Value per Share on the date the Company exercises its repurchase right.  This repurchase right may be exercised by the Company at any time during the period commencing on the date the forfeiture event occurs and ending on the date that is six months following the date of such forfeiture event occurs (the "Repurchase Period") upon payment by the Company of the repurchase price to the Holder of the repurchased Shares.  Any Shares of Restricted Stock that the Company does not repurchase during the Repurchase Period shall become vested and nonforfeitable at the expiration of the Repurchase Period.

SECTION 8.     UNRESTRICTED STOCK AWARDS

(a)     Grant or Sale of Unrestricted Stock.  The Committee may, in its sole discretion, grant (or sell at par value or such higher purchase price determined by the Committee) an Unrestricted Stock Award to any Grantee, pursuant to which such Grantee may receive Shares free of any vesting restrictions under the Plan.  Unrestricted Stock Awards may be granted or sold as described in the preceding sentence in respect of past services or other valid consideration, or in lieu of any cash compensation due to such individual or entity.

(b)     Elections to Receive Unrestricted Stock In Lieu of Compensation.  Upon the request of a Grantee and with the consent of the Committee, each such Grantee may, pursuant to an advance written election delivered to the Company no later than the date specified by the Committee, receive a portion of the cash compensation otherwise due to such Grantee in the form of Shares of Unrestricted Stock.

SECTION 9.     TRANSFER RESTRICTIONS; COMPANY RIGHT OF FIRST REFUSAL; COMPANY REPURCHASE RIGHTS

(a)     Restrictions on Transfer.

Case 4:17-cv-05712-PJH   Document 14-1   Filed 01/12/21   Page 19 of 43

(i)    Options.  No Stock Option shall be transferable by the Grantee otherwise than by will or by the laws of descent and distribution and all Stock Options shall be exercisable, during the Grantee's lifetime, only by the Grantee, or by the Grantee's legal representative or guardian in the event of the Grantee's incapacity.  The Grantee may elect to designate a beneficiary by providing written notice of the name of such beneficiary to the Company, and may revoke or change such designation at any time by filing written notice of revocation or change with the Company, and any such beneficiary may exercise the Grantee's Stock Option in the event of the Grantee's death to the extent provided herein.  If the Grantee does not designate a beneficiary, or if the designated beneficiary predeceases the Grantee, the legal representative of the Grantee may exercise this Stock Option in the event of the Grantee's death to the extent provided herein.  Notwithstanding the foregoing, the Committee, in its sole discretion, may provide in the Award agreement regarding a given Option that the Grantee may transfer, without consideration for the transfer, his or her NonQualified Stock Options to a Permitted Transferee, provided that the Permitted Transferee agrees in writing with the Company to be bound by all of the terms and conditions of this Plan and the applicable Option.

(ii)    Issued Shares.  No Issued Shares shall be sold, assigned, transferred, pledged, hypothecated, given away or in any other manner disposed of or encumbered, whether voluntarily or by operation of law, unless (i) such transfer is in compliance with the terms of the applicable Award, all applicable securities laws (including, without limitation, the Act), and with the terms and conditions of this Section 9, (ii) such transfer does not cause the Company to become subject to the reporting requirements of the Exchange Act, and (iii) the transferee consents in writing to be bound by the provisions of the Plan, including this Section 9.  In connection with any proposed transfer, the Committee may require the transferor to provide at the transferor's own expense an opinion of counsel to the transferor, satisfactory to the Committee, that such transfer is in compliance with all foreign, federal and state securities laws (including, without limitation, the Securities Act).  Any attempted disposition of Issued Shares not in accordance with the terms and conditions of this Section 9 shall be null and void, and the Company shall not reflect on its records any change in record ownership of any Issued Shares as a result of any such disposition, shall otherwise refuse to recognize any such disposition and shall not in any way give effect to any such disposition of Issued Shares.  Subject to the foregoing general provisions, and unless otherwise provided in the agreement with respect to a particular Award, Issued Shares may be transferred pursuant to the following specific terms and conditions (provided that with respect to any transfer of Restricted Stock, all vesting and forfeiture provisions shall continue to apply only with respect to the Grantee):

(A)    Transfers to Permitted Transferees.  The Holder may sell, assign, transfer or give away any or all of the Issued Shares to Permitted Transferees; *provided, however,* that following such sale, assignment, or other transfer, such Issued Shares shall continue to be subject to the terms of this Plan (including this Section 9) and such Permitted Transferee(s) must, as a condition to any such transfer, deliver a written acknowledgment to that effect to the Company.

(B)    Transfers Upon Death.  Upon the death of the Holder, any Issued Shares then held by the Holder at the time of such death and any Issued Shares acquired thereafter by the Holder's estate, executors, administrators, personal representatives, heirs, legatees and distributees shall be subject to the provisions of this Plan (including this Section 9).

15

(b)    <u>Right of First Refusal</u>.  In the event that a Holder desires at any time to sell or otherwise transfer all or any part of such Holder's Issued Shares to any Person, the Holder shall comply with Article VI of the Company's Bylaws.

(c)    <u>Company's Right of Repurchase</u>.

(i)    <u>Right of Repurchase for Option Shares</u>.  The Company or its assigns shall have the right and option upon the occurrence of a Repurchase Event with respect to a Holder of Option Shares to repurchase from such Holder some or all (as determined by the Company) of the Option Shares held or subsequently acquired upon exercise of a Stock Option by such Holder at the price per Share specified below.  Such repurchase right may be exercised by the Company at any time during the period commencing on the date the Repurchase Event occurs and ending on the later of (A) the date that is six months following the date of such Repurchase Event or (B) the date that is seven months after the acquisition of such Option Shares upon exercise of a Stock Option (the "Option Shares Repurchase Period").  The "Option Shares Repurchase Price" shall be the Fair Market Value of the Option Shares; *provided, however,* that in the case of a Restrictive Covenant Breach, the Option Shares Repurchase Price shall be the lesser of Fair Market Value of the Option Shares or the purchase price paid by the Grantee (or Holder) for the Option Shares upon exercise of Options by the Grantee (or Holder).  Fair Market Value of the Option Shares shall be determined as of the date the Committee elects to exercise its repurchase rights in connection with such Repurchase Event.

(ii)    <u>Right of Repurchase With Respect to Restricted Stock</u>.  Unless otherwise set forth in the agreement entered into by the Grantee and the Company in connection with a Restricted Stock Award, the Company or its assigns shall have the right and option upon a Repurchase Event to repurchase from a Holder of Issued Shares received pursuant to a Restricted Stock Award some or all (as determined by the Company) of such Issued Shares at the price per Share specified below.  Such repurchase right may be exercised by the Company at any time during the period commencing on the date the Repurchase Event occurs and ending on the date that is six months following the date of such Repurchase Event (the "Non-Option Shares Repurchase Period").  The "Non-Option Shares Repurchase Price" shall be the Fair Market Value of such Issued Shares; *provided, however,* that in the case of a Restrictive Covenant Breach, the Non-Option Shares Repurchase Price shall be the lesser of Fair Market Value of the Issued Shares or the original purchase price paid by the Grantee for the Issued Shares received pursuant to a Restricted Stock Award.  Fair Market Value of the Option Shares shall be determined as of the date the Committee elects to exercise its repurchase rights in connection with such Repurchase Event.

16

(iii)   Procedure.  Any repurchase right of the Company shall be exercised by the Company or its assigns by giving the Holder written notice on or before the last day of the Option Shares Repurchase Period or Non-Option Shares Repurchase Period, as applicable, of its intention to exercise such repurchase right.  Upon such notification, the Holder shall promptly surrender to the Company, free and clear of any liens or encumbrances, any certificates representing the Shares being purchased, together with a duly executed stock power for the transfer of such Shares to the Company or the Company's assignee or assignees.  Upon the Company's or its assignee's receipt of the certificates from the Holder, the Company or its assignee or assignees shall deliver to him, her or them a check for the Option Shares Repurchase Price or the Non-Option Shares Repurchase Price, as applicable; *provided, however,* that the Company may pay the Option Shares Repurchase Price or Non-Option Shares Repurchase Price, as applicable, by offsetting and canceling any indebtedness then owed by the Holder to the Company.

(d)   Drag Along Right.  In the event the holders of a majority of the Company's voting capital stock then outstanding (the "Majority Shareholders") determine to sell or otherwise dispose of all or substantially all of the assets of the Company or all or fifty percent (50%) or more of the capital stock of the Company, in each case in a transaction constituting a change in control of the Company, to any nonAffiliate(s) of the Company or any of the Majority Shareholders, or to cause the Company to merge with or into or consolidate with any non-Affiliate(s) of the Company or any of the Majority Shareholders (in each case, the "Buyer") in a *bona fide* negotiated transaction (a "Sale"), each Holder of Issued Shares, including any Permitted Transferees, shall be obligated to and shall upon the written request of the Majority Shareholders:  (a) sell, transfer and deliver, or cause to be sold, transferred and delivered, to the Buyer, his or her Issued Shares (including for this purpose all of such Holder's or his or her Permitted Transferee's Issued Shares that presently or as a result of any such transaction may be acquired upon the exercise of an Option (following the payment of the exercise price therefor)) on substantially the same terms applicable to the Majority Shareholders (with appropriate adjustments to reflect the conversion of convertible securities, the redemption of redeemable securities and the exercise of exercisable securities as well as the relative preferences and priorities of preferred stock); and (b) execute and deliver such instruments of conveyance and transfer and take such other action, including voting such Issued Shares in favor of any Sale proposed by the Majority Shareholders and executing any purchase agreements, merger agreements, indemnity agreements, escrow agreements or related documents as the Majority Shareholders or the Buyer may reasonably require in order to carry out the terms and provisions of this Section 9(d).

(e)   Escrow Arrangement.

(i)      Escrow.  In order to carry out the provisions of Sections 7(e) and 9(b), (c), and (d) of this Agreement more effectively, the Company shall hold any Issued Shares in escrow together with separate stock powers executed by the Holder in blank for transfer, and any Permitted Transferee shall, as an additional condition to any transfer of Issued Shares, execute a like stock power as to such Issued Shares.  The Company shall not dispose of the Issued Shares except as otherwise provided in this Agreement.  In the event of any repurchase by the Company (or any of its assigns), the Company is hereby authorized by the Holder and any Permitted Transferee, as the Holder's and each such Permitted Transferee's attorney-in-fact, to date and complete the stock powers necessary for the transfer of the Issued Shares being purchased and to transfer such Issued Shares in accordance with the terms hereof.  At such time as any Issued Shares are no longer subject to the Company's repurchase, first refusal and drag along rights, the Company shall, at the written request of the Holder, deliver to the Holder (or the relevant Permitted Transferee) a certificate representing such Issued Shares with the balance of the Issued Shares to be held in escrow pursuant to this Section 9(e).

(ii)      Remedy.  Without limitation of any other provision of this Agreement or other rights, in the event that a Holder, any Permitted Transferees or any other Person is required to sell a Holder's Issued Shares pursuant to the provisions of Sections 7(e) or 9(b), (c), or (d) hereof and in the further event that he or she refuses or for any reason fails to deliver to the Company or its designated purchaser of such Issued Shares the certificate or certificates evidencing such Issued Shares together with a related stock power, the Company or such designated purchaser may deposit the applicable purchase price for such Issued Shares with a bank designated by the Company, or with the Company's independent public accounting firm, as agent or trustee, or in escrow, for such Holder, any Permitted Transferees or other Person, to be held by such bank or accounting firm for the benefit of and for delivery to him, her, them or it, and/or, in its discretion, pay such purchase price by offsetting any indebtedness then owed by such Holder as provided above.  Upon any such deposit and/or offset by the Company or its designated purchaser of such amount and upon notice to the Person who was required to sell the Issued Shares to be sold pursuant to the provisions of Sections 7(e) or 9(b), (c), or (d), such Issued Shares shall at such time be deemed to have been sold, assigned, transferred and conveyed to such purchaser, such Holder shall have no further rights thereto (other than the right to withdraw the payment thereof held in escrow, if applicable), and the Company shall record such transfer in its stock transfer book or in any appropriate manner.

(f)      Lockup Provision.  Each Holder shall agree, if requested by the Company and any underwriter engaged by the Company, not to sell or otherwise transfer or dispose of any Issued Shares (including, without limitation, pursuant to Rule 144 under the Securities Act) held by him or her for such period following the effective date of any registration statement of the Company filed under the Securities Act as the Company or such underwriter shall specify reasonably and in good faith, not to exceed 180 days in the case of the Company's initial public offering or 90 days in the case of any other public offering.

(g)     Adjustments for Changes in Capital Structure.  If, as a result of any reorganization, recapitalization, reclassification, stock dividend, stock split, reverse stock split, spin-off, split-up or other similar change in the Common Stock, the outstanding Shares are increased or decreased or are exchanged for a different number or kind of security of the Company, the restrictions contained in this Section 9 shall apply with equal force to additional and/or substitute securities, if any, received by Holder in exchange for, or by virtue of his or her ownership of, Issued Shares.

(h)     Transfers to Competitors.  Notwithstanding anything contained herein to the contrary, no Issued Shares may be sold or otherwise transferred to a party that is a competitor of the Company without the prior written approval of the Board.  Any sale or other purported sale of Issued Shares in violation of this Section 9(h) shall be null and void.

(i)     Termination.  The terms and provisions of Section 9(b), Section 9(c), Section 9(d) and Section 9(h) shall terminate upon the closing of the Company's initial public offering or upon consummation of any Sale Event, in either case as a result of which Shares of the same class as the Issued Shares are registered under Section 12 of the Exchange Act and publicly traded on NASDAQ/NMS or any national security exchange.

SECTION 10.   TAX WITHHOLDING

(a)     Payment by Grantee.  Each Grantee shall, no later than the date as of which the value of an Award or of any Stock or other amounts received thereunder first becomes includable in the gross income of the Grantee for federal income tax purposes, pay to the Company, or make arrangements satisfactory to the Committee regarding payment of, any federal, state, or local taxes of any kind required by law to be withheld with respect to such income.  The Company and its Subsidiaries shall, to the extent permitted by law, have the right to deduct any such taxes from any payment of any kind otherwise due to the Grantee.  The Company's obligation to deliver stock certificates to any Grantee is subject to and conditioned on any such tax obligations being satisfied by the Grantee.

(b)     Payment in Stock.  Subject to approval by the Committee, a Grantee may elect to have the minimum required tax withholding obligation satisfied, in whole or in part, by (i) authorizing the Company to withhold from Shares to be issued pursuant to any Award a number of Shares with an aggregate Fair Market Value (as of the date the withholding is effected) that would satisfy the withholding amount due, or (ii) transferring to the Company Shares owned by the Grantee with an aggregate Fair Market Value (as of the date the withholding is effected) that would satisfy the minimum withholding amount due.

SECTION 11.   AMENDMENTS AND TERMINATION

The Board may, at any time, amend or discontinue the Plan and the Committee may, at any time, amend or cancel any outstanding Award (or provide substitute Awards at the same or a reduced exercise or purchase price or with no exercise or purchase price) in a manner not inconsistent with the terms of the Plan, provided that such price, if any, must satisfy the requirements that would apply to the substitute or amended Award if it were then initially granted under this Plan for the purpose of satisfying changes in law or for any other lawful purpose, but no such action shall adversely affect rights under any outstanding Award without the holder's consent.  In addition, to the extent determined by the Committee to be

19

required by the Code to ensure that Incentive Stock Options granted under the Plan are qualified under Section 422 of the Code, Plan amendments shall be subject to approval by the Company's stockholders who are entitled to vote at a meeting of stockholders. Nothing in this Section 11 shall limit the Committee's authority to take any action permitted pursuant to Section 3(c).

SECTION 12.   STATUS OF PLAN

With respect to the portion of any Award that has not been exercised and any payments in cash, Stock or other consideration not received by a Grantee, a Grantee shall have no rights greater than those of a general creditor of the Company unless the Committee shall otherwise expressly determine in connection with any Award or Awards. In its sole discretion, the Committee may authorize the creation of trusts or other arrangements to meet the Company's obligations to deliver Stock or make payments with respect to Awards hereunder, provided that the existence of such trusts or other arrangements is consistent with the foregoing sentence.

SECTION 13.   GENERAL PROVISIONS

(a)   No Distribution; Compliance with Legal Requirements. The Committee may require each Person acquiring Shares pursuant to an Award to represent to and agree with the Company in writing that such Person is acquiring the Shares without a view to distribution thereof. No Shares shall be issued pursuant to an Award until all applicable securities law and other legal requirements have been satisfied. The Committee may require the placing of restrictive legends (in addition to the legend set forth in Section 13(b)) on certificates for Stock and Awards as it deems appropriate.

(b)   Legend. Any certificate(s) representing the Issued Shares shall carry substantially the following legend:

> "THE TRANSFERABILITY OF THIS CERTIFICATE AND THE SHARES OF STOCK REPRESENTED HEREBY ARE SUBJECT TO THE RESTRICTIONS, TERMS AND CONDITIONS (INCLUDING REPURCHASE AND RESTRICTIONS AGAINST TRANSFERS) CONTAINED IN THE COGNICAL, INC. 2014 STOCK INCENTIVE PLAN AND ANY AGREEMENT ENTERED INTO THEREUNDER BY AND BETWEEN THE COMPANY AND THE HOLDER OF THIS CERTIFICATE (A COPY OF WHICH IS AVAILABLE AT THE OFFICES OF THE COMPANY FOR EXAMINATION)."

(c)    Delivery of Stock Certificates.  Stock certificates to Grantees under this Plan shall be deemed delivered for all purposes when the Company or a stock transfer agent of the Company shall have mailed such certificates in the United States mail, addressed to the Grantee, at the Grantee's last known address on file with the Company.

(d)    Other Compensation Arrangements; No Employment Rights.  Nothing contained in this Plan shall prevent the Board from adopting other or additional compensation arrangements, including trusts, and such arrangements may be either generally applicable or applicable only in specific cases.  The adoption of this Plan and the grant of Awards do not confer upon any Grantee or Eligible Person the right to employment by the Company or any Subsidiary or the right to remain in any other service relationship with the Company or any Subsidiary.

(e)    Loans to Award Recipients.  The Company shall have the authority to make loans to Grantees hereunder (including to facilitate the purchase of Shares) and shall further have the authority to issue Shares for promissory notes hereunder.

(f)    Designation of Beneficiary.  Each Grantee to whom an Award has been made under the Plan may designate a beneficiary or beneficiaries to exercise any Award or receive any payment under any Award payable on or after the Grantee's death.  Any such designation shall be on a form provided for that purpose by the Committee and shall not be effective until received by the Committee.  If no beneficiary has been designated by a deceased Grantee, or if the designated beneficiaries have predeceased the Grantee, the beneficiary shall be the Grantee's estate.

SECTION 14.    EFFECTIVE DATE AND DURATION OF PLAN

This Plan shall become effective upon approval by the stockholders in accordance with applicable law.  Subject to such approval by the stockholders and to the requirement that no Stock may be issued hereunder prior to such approval, Stock Options and other Awards may be granted hereunder on and after adoption of this Plan by the Board.

The Plan shall remain in effect, subject to the right of the Board to amend or terminate the Plan at any time pursuant to Section 11 hereof, until the tenth (10th) anniversary of the Effective Date of the Plan.  The termination of the Plan shall not affect the terms of any Awards outstanding on the date of termination.

SECTION 15.    GOVERNING LAW

This Plan and all Awards and actions taken thereunder shall be governed by, construed and enforced in accordance with, the laws of the State of Delaware, applied without regard to conflict of laws principles.

SECTION 16.  <u>DISPUTE RESOLUTION</u>

(a)      Except as provided below, any dispute arising out of or relating to this Plan or any Award made hereunder, or any agreement executed in connection herewith, or the breach, termination or validity of this Plan, any such Award or any such agreement, shall be finally settled by binding arbitration conducted expeditiously in accordance with the J.A.M.S./Endispute Comprehensive Arbitration Rules and Procedures (the "J.A.M.S. Rules").  The arbitration shall be governed by the United States Arbitration Act, 9 U.S.C. Sections 116, and judgment upon the award rendered by the arbitrators may be entered by any court having jurisdiction thereof.  The place of arbitration shall be within the State of New York.

(b)      The arbitration shall commence within 60 days of the date on which a written demand for arbitration is filed by any party hereto.  In connection with the arbitration proceeding, the arbitrator shall have the power to order the production of documents by each party and any third-party witnesses.  In addition, each party may take up to three (3) depositions as of right, and the arbitrator may in his or her discretion allow additional depositions upon good cause shown by the moving party.  However, the arbitrator shall not have the power to order the answering of interrogatories or the response to requests for admission.  In connection with any arbitration, each party to the arbitration shall provide to the other, no later than seven (7) business days before the date of the arbitration, the identity of all individuals who may testify at the arbitration and a copy of all documents that may be introduced at the arbitration or considered or used by a party's witness or expert.  The arbitrator's decision and award shall be made and delivered within six (6) months of the selection of the arbitrator.  The arbitrator's decision shall set forth a reasoned basis for any award of damages or finding of liability.  The arbitrator shall not have power to award damages in excess of actual compensatory damages and shall not multiply actual damages or award punitive damages, and each party hereby irrevocably waives any claim to such damages.

(c)      The Company, each Grantee hereunder, each party to an agreement governed hereby and any other Holder of Stock issued under this Plan (each, a "Party") covenants and agrees that such Party will participate in the arbitration in good faith.  This Section 16 applies equally to requests for temporary, preliminary or permanent injunctive relief, except that in the case of temporary or preliminary injunctive relief any party may proceed in court without prior arbitration for the limited purpose of avoiding immediate and irreparable harm.

22

(d)    Each Party (i) hereby irrevocably submits to the jurisdiction of any United States District Court of competent jurisdiction for the purpose of enforcing the award or decision in any such proceeding, (ii) hereby waives, and agrees not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not subject personally to the jurisdiction of the abovenamed courts, that its property is exempt or immune from attachment or execution (except as protected by applicable law), that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such court, and (iii) hereby waives and agrees not to seek any review by any court of any other jurisdiction which may be called upon to grant an enforcement of the judgment of any such court.  Each Party hereby consents to service of process by registered mail at the address to which notices are to be given.  Each Party agrees that its, his or her submission to jurisdiction and its, his or her consent to service of process by mail is made for the express benefit of each other Party.  Final judgment against any Party in any such action, suit or proceeding may be enforced in other jurisdictions by suit, action or proceeding on the judgment, or in any other manner provided by or pursuant to the laws of such other jurisdiction.

DATE APPROVED BY BOARD OF DIRECTORS:  June ___, 2014

DATE APPROVED BY STOCKHOLDERS:  June ___, 2014

23

**EXHIBIT B**



# JAMS Comprehensive Arbitration Rules & Procedures

*Effective June 1, 2021*

We understand that there is a lot on the line in arbitration. We know attorneys count on JAMS to provide highly skilled arbitrators who use JAMS Managed Arbitration Process to save time and money. JAMS offers efficiency, speed, and results.

If another arbitration provider was written into your contract, **call an experienced JAMS Case Manager** to discuss having your case administered by JAMS.

A summary of the June 1, 2021 revisions may be found **here**.

## Related Links

- **Arbitration Services at JAMS**
- **Submit a Case**

## Table of Contents

- **Rule 1. Scope of Rules**
- **Rule 2. Party Self-Determination and Emergency Relief Procedures**
- **Rule 3. Amendment of Rules**
- **Rule 4. Conflict with Law**
- **Rule 5. Commencing an Arbitration**
- **Rule 6. Preliminary and Administrative Matters**
- **Rule 7. Number and Neutrality of Arbitrators; Appointment and Authority of Chairperson**
- **Rule 8. Service**
- **Rule 9. Notice of Claims**
- **Rule 10. Changes of Claims**
- **Rule 11. Interpretation of Rules and Jurisdictional Challenges**
- **Rule 12. Representation**
- **Rule 13. Withdrawal from Arbitration**
- **Rule 14. *Ex Parte* Communications**
- **Rule 15. Arbitrator Selection, Disclosures and Replacement**
- **Rule 16. Preliminary Conference**
  - **Rule 16.1. Application of Expedited Procedures**
- **Rule 16.2. Where Expedited Procedures Are Applicable**

- **Rule 17. Exchange of Information**

- **Rule 18. Summary Disposition of a Claim or Issue**

- **Rule 19. Scheduling and Location of Hearing**

- **Rule 20. Pre-Hearing Submissions**

- **Rule 21. Securing Witnesses and Documents for the Arbitration Hearing**

- **Rule 22. The Arbitration Hearing**

- **Rule 23. Waiver of Hearing**

- **Rule 24. Awards**

- **Rule 25. Enforcement of the Award**

- **Rule 26. Confidentiality and Privacy**

- **Rule 27. Waiver**

- **Rule 28. Settlement and Consent Award**

- **Rule 29. Sanctions**

- **Rule 30. Disqualification of the Arbitrator as a Witness or Party and Exclusion of Liability**

- **Rule 31. Fees**

- **Rule 32. Bracketed (or High-Low) Arbitration Option**

- **Rule 33. Final Offer (or Baseball) Arbitration Option**

- **Rule 34. Optional Arbitration Appeal Procedure**

# Rule 1. Scope of Rules

(a) The JAMS Comprehensive Arbitration Rules and Procedures ("Rules") govern binding Arbitrations of disputes or claims that are administered by JAMS and in which the Parties agree to use these Rules or, in the absence of such agreement, any disputed claim or counterclaim that exceeds $250,000, not including interest or attorneys' fees, unless other Rules are prescribed.

(b) The Parties shall be deemed to have made these Rules a part of their Arbitration Agreement ("Agreement") whenever they have provided for Arbitration by JAMS under its Comprehensive Rules or for Arbitration by JAMS without specifying any particular JAMS Rules and the disputes or claims meet the criteria of the first paragraph of this Rule.

(c) The authority and duties of JAMS as prescribed in the Agreement of the Parties and in these Rules shall be carried out by the JAMS National Arbitration Committee ("NAC") or the office of JAMS General Counsel or their designees.

(d) JAMS may, in its discretion, assign the administration of an Arbitration to any of its Resolution Centers.

(e) The term "Party" as used in these Rules includes Parties to the Arbitration and their counsel or representatives.

(f) "Electronic filing" (e-filing) means the electronic transmission of documents to JAMS for the purpose of filing via the Internet. "Electronic service" (e-service) means the electronic transmission of documents to a Party, attorney or representative under these Rules.

# Rule 2. Party Self-Determination and Emergency Relief Procedures

(a) The Parties may agree on any procedures not specified herein or in lieu of these Rules that are consistent with the applicable law and JAMS policies (including, without limitation, Rules 15(i), 30 and 31). The Parties shall promptly notify JAMS of any such Party-agreed procedures and shall confirm such procedures in writing. The Party-agreed procedures shall be enforceable as if contained in these Rules.

(b)　　　an Arbitration Agreement provides that the Arbitration will be non-administered or administered by an entity othe..　JAMS and/or conducted in accordance with rules other than JAMS Rules, the Parties may agree to modify that Agreement to provide that the Arbitration will be administered by JAMS and/or conducted in accordance with JAMS

Rules.

(c) Emergency Relief Procedures. These Emergency Relief Procedures are available in Arbitrations filed and served after July 1, 2014, and where not otherwise prohibited by law. Parties may agree to opt out of these Procedures in their Arbitration Agreement or by subsequent written agreement.

(i) A Party in need of emergency relief prior to the appointment of an Arbitrator may notify JAMS and all other Parties in writing of the relief sought and the basis for an Award of such relief. This Notice shall include an explanation of why such relief is needed on an expedited basis. Such Notice shall be given by email or personal delivery. The Notice must include a statement certifying that all other Parties have been notified. If all other Parties have not been notified, the Notice shall include an explanation of the efforts made to notify such Parties.

(ii) JAMS shall promptly appoint an Emergency Arbitrator to rule on the emergency request. In most cases the appointment of an Emergency Arbitrator will be done within 24 hours of receipt of the request. The Emergency Arbitrator shall promptly disclose any circumstance likely, based on information disclosed in the application, to affect the Arbitrator's ability to be impartial or independent. Any challenge to the appointment of the Emergency Arbitrator shall be made within 24 hours of the disclosures by the Emergency Arbitrator. JAMS will promptly review and decide any such challenge. JAMS' decision shall be final.

(iii) Within two business days, or as soon as practicable thereafter, the Emergency Arbitrator shall establish a schedule for the consideration of the request for emergency relief. The schedule shall provide a reasonable opportunity for all Parties to be heard taking into account the nature of the relief sought. The Emergency Arbitrator has the authority to rule on his or her own jurisdiction and shall resolve any disputes with respect to the request for emergency relief.

(iv) The Emergency Arbitrator shall determine whether the Party seeking emergency relief has shown that immediate loss or damage will result in the absence of emergency relief and whether the requesting Party is entitled to such relief. The Emergency Arbitrator shall enter an order or Award granting or denying the relief, as the case may be, and stating the reasons therefor.

(v) Any request to modify the Emergency Arbitrator's order or Award must be based on changed circumstances and may be made to the Emergency Arbitrator until such time as an Arbitrator or Arbitrators are appointed in accordance with the Parties' Agreement and JAMS' usual procedures. Thereafter, any request related to the relief granted or denied by the Emergency Arbitrator shall be determined by the Arbitrator(s) appointed in accordance with the Parties' Agreement and JAMS' usual procedures.

(vi) In the Emergency Arbitrator's discretion, any interim Award of emergency relief may be conditioned on the provision of adequate security by the Party seeking such relief.

## Rule 3. Amendment of Rules

JAMS may amend these Rules without notice. The Rules in effect on the date of the commencement of an Arbitration (as defined in Rule 5) shall apply to that Arbitration, unless the Parties have agreed upon another version of the Rules.

## Rule 4. Conflict with Law

If any of these Rules, or modification of these Rules agreed to by the Parties, is determined to be in conflict with a provision of applicable law, the provision of law will govern over the Rule in conflict, and no other Rule will be affected.

## Rule 5. Commencing an Arbitration

(a) The Arbitration is deemed commenced when JAMS issues a Commencement Letter based upon the existence of one of the following:

(i) A post-dispute Arbitration Agreement fully executed by all Parties specifying JAMS administration or use of any JAMS Rules; or

(ii) A pre-dispute written contractual provision requiring the Parties to arbitrate the dispute or claim and specifying JAMS administration or use of any JAMS Rules or that the Parties agree shall be administered by JAMS; or

(iii) A written confirmation of an oral agreement of all Parties to participate in an Arbitration administered by JAMS or conducted pursuant to any JAMS Rules; or

(iv) ¯ ˜espondent's failure to timely object to JAMS administration, where the Parties' Arbitration Agreement does not spe      MS administration or JAMS Rules; or

(v) A copy of a court order compelling Arbitration at JAMS.

(b) The issuance of the Commencement Letter confirms that requirements for commencement have been met, that JAMS has received all payments required under the applicable fee schedule and that the Claimant has provided JAMS with contact information for all Parties together with evidence that the Demand for Arbitration has been served on all Parties.

(c) If a Party that is obligated to arbitrate in accordance with subparagraph (a) of this Rule fails to agree to participate in the Arbitration process, JAMS shall confirm in writing that Party's failure to respond or participate, and, pursuant to Rule 22(j), the Arbitrator, once appointed, shall schedule, and provide appropriate notice of, a Hearing or other opportunity for the Party demanding the Arbitration to demonstrate its entitlement to relief.

(d) The date of commencement of the Arbitration is the date of the Commencement Letter but is not intended to be applicable to any legal requirement, such as the statute of limitations; any contractual limitations period; or any claims notice requirement. The term "commencement," as used in this Rule, is intended only to pertain to the operation of this and other Rules (such as Rules 3, 13(a), 17(a) and 31(a)).

## Rule 6. Preliminary and Administrative Matters

(a) JAMS may convene, or the Parties may request, administrative conferences to discuss any procedural matter relating to the administration of the Arbitration.

(b) If no Arbitrator has yet been appointed, at the request of a Party and in the absence of Party agreement, JAMS may determine the location of the Hearing, subject to Arbitrator review. In determining the location of the Hearing, such factors as the subject matter of the dispute, the convenience of the Parties and witnesses, and the relative resources of the Parties shall be considered.

(c) If, at any time, any Party has failed to pay fees or expenses in full, JAMS may order the suspension or termination of the proceedings. JAMS may so inform the Parties in order that one of them may advance the required payment. If one Party advances the payment owed by a non-paying Party, the Arbitration shall proceed, and the Arbitrator may allocate the non-paying Party's share of such costs, in accordance with Rules 24(f) and 31(c). An administrative suspension shall toll any other time limits contained in these Rules or the Parties' Agreement.

(d) JAMS does not maintain an official record of documents filed in the Arbitration. If the Parties wish to have any documents returned to them, they must advise JAMS in writing within thirty (30) calendar days of the conclusion of the Arbitration. If special arrangements are required regarding file maintenance or document retention, they must be agreed to in writing, and JAMS reserves the right to impose an additional fee for such special arrangements. Documents that are submitted for e-filing are retained for thirty (30) calendar days following the conclusion of the Arbitration.

(e) Unless the Parties' Agreement or applicable law provides otherwise, JAMS, if it determines that the Arbitrations so filed have common issues of fact or law, may consolidate Arbitrations in the following instances:

(i) If a Party files more than one Arbitration with JAMS, JAMS may consolidate two or more of the Arbitrations into a single Arbitration.

(ii) Where a Demand or Demands for Arbitration is or are submitted naming Parties already involved in another Arbitration or Arbitrations pending under these Rules, JAMS may decide that the new case or cases shall be consolidated into one or more of the pending proceedings and referred to one of the Arbitrators or panels of Arbitrators already appointed.

(iii) Where a Demand or Demands for Arbitration is or are submitted naming Parties that are not identical to the Parties in the existing Arbitration or Arbitrations, JAMS may decide that the new case or cases shall be consolidated into one or more of the pending proceedings and referred to one of the Arbitrators or panels of Arbitrators already appointed.

When rendering its decision, JAMS will take into account all circumstances, including the links between the cases and the progress already made in the existing Arbitrations.

Unless applicable law provides otherwise, where JAMS decides to consolidate a proceeding into a pending Arbitration, the Parties to the consolidated case or cases will be deemed to have waived their right to designate an Arbitrator as well as any contractual provision with respect to the site of the Arbitration.

(f) Where a third party seeks to participate in an Arbitration already pending under these Rules or where a Party to an Arbitration under these Rules seeks to compel a third party to participate in a pending Arbitration, the Arbitrator shall determine such request, taking into account all circumstances he or she deems relevant and applicable.

## Rule 7. Number and Neutrality of Arbitrators; Appointment and Authority of Chairperson

(a) The Arbitration shall be conducted by one neutral Arbitrator, unless all Parties agree otherwise. In these Rules, the term "...trator" shall mean, as the context requires, the Arbitrator or the panel of Arbitrators in a tripartite Arbitration.

(b) In cases involving more than one Arbitrator, the Parties shall agree on, or, in the absence of agreement, JAMS shall designate, the Chairperson of the Arbitration Panel. If the Parties and the Arbitrators agree, a single member of the Arbitration Panel may, acting alone, decide discovery and procedural matters, including the conduct of hearings to receive documents and testimony from third parties who have been subpoenaed, in advance of the Arbitration Hearing, to produce documents.

(c) Where the Parties have agreed that each Party is to name one Arbitrator, the Arbitrators so named shall be neutral and independent of the appointing Party, unless the Parties have agreed that they shall be non-neutral.

## Rule 8. Service

(a) JAMS or the Arbitrator may at any time require electronic filing and service of documents in an Arbitration, including through the JAMS Electronic Filing System. If JAMS or the Arbitrator requires electronic filing and service, the Parties shall maintain and regularly monitor a valid, usable and live email address for the receipt of documents and notifications. Any document filed via the JAMS Electronic Filing System shall be considered as filed when the transmission to the JAMS Electronic Filing System is complete. Any document e-filed by 11:59 p.m. (of the sender's time zone) shall be deemed filed on that date.

(b) Every document filed with the JAMS Electronic Filing System shall be deemed to have been signed by the Arbitrator, Case Manager, attorney or declarant who submits the document to the JAMS Electronic Filing System, and shall bear the typed name, address and telephone number of a signing attorney.

(c) Delivery of e-service documents through the JAMS Electronic Filing System shall be considered as valid and effective service and shall have the same legal effect as an original paper document. Recipients of e-service documents shall access their documents through the JAMS Electronic Filing System. E-service shall be deemed complete when the Party initiating e-service or JAMS completes the transmission of the electronic document(s) to the JAMS Electronic Filing System for e-filing and/or e-service.

(d) If an electronic filing and/or service via JAMS Electronic Filing System does not occur due to technical error in the transmission of the document, the Arbitrator or JAMS may, for good cause shown, permit the document to be filed and/or served *nunc pro tunc* to the date it was first attempted to be transmitted electronically. In such cases a Party shall, absent extraordinary circumstances, be entitled to an order extending the date for any response or the period within which any right, duty or other act must be performed.

(e) For documents that are not filed electronically, service by a Party under these Rules is effected by providing one signed copy of the document to each Party and two copies in the case of a sole Arbitrator and four copies in the case of a tripartite panel to JAMS. Service may be made by hand-delivery, overnight delivery service or U.S. mail. Service by any of these means is considered effective upon the date of deposit of the document.

(f) In computing any period of time prescribed or allowed by these Rules for a Party to do some act within a prescribed period after the service of a notice or other paper on the Party and the notice or paper is served on the Party only by U.S. mail, three (3) calendar days shall be added to the prescribed period. If the last day for the performance of any act that is required by these Rules to be performed within a specific time falls on a Saturday, Sunday or other legal holiday, the period is extended to and includes the next day that is not a holiday.

## Rule 9. Notice of Claims

(a) Each Party shall afford all other Parties reasonable and timely notice of its claims, affirmative defenses or counterclaims. Any such notice shall include a short statement of its factual basis. No claim, remedy, counterclaim or affirmative defense will be considered by the Arbitrator in the absence of such prior notice to the other Parties, unless the Arbitrator determines that no Party has been unfairly prejudiced by such lack of formal notice or all Parties agree that such consideration is appropriate notwithstanding the lack of prior notice.

(b) Claimant's notice of claims is the Demand for Arbitration referenced in Rule 5. It shall include a statement of the remedies sought. The Demand for Arbitration may attach and incorporate a copy of a Complaint previously filed with a court. In the latter case, Claimant may accompany the Complaint with a copy of any Answer to that Complaint filed by any Respondent.

(c) Within fourteen (14) calendar days of service of the notice of claim, a Respondent may submit to JAMS and serve on other Parties a response and a statement of any affirmative defenses, including jurisdictional challenges, or counterclaims it may have. JAMS may grant reasonable extensions of time to file a response or counterclaim prior to the appointment of the Arbitrator.

(d) Within fourteen (14) calendar days of service of a counterclaim, a Claimant may submit to JAMS and serve on other Parties a response to such counterclaim and any affirmative defenses, including jurisdictional challenges, it may have.

(e) Any claim or counterclaim to which no response has been served will be deemed denied.

(f) Jurisdictional challenges under Rule 11 shall be deemed waived, unless asserted in a response to a Demand or counterclaim or promptly thereafter, when circumstances first suggest an issue of arbitrability.

## Rule 10. Changes of Claims

After the filing of a claim and before the Arbitrator is appointed, any Party may make a new or different claim against a Party or any third party that is subject to Arbitration in the proceeding. Such claim shall be made in writing, filed with JAMS and served on the other Parties. Any response to the new claim shall be made within fourteen (14) calendar days after service of such claim. After the Arbitrator is appointed, no new or different claim may be submitted, except with the Arbitrator's approval. A Party may request a hearing on this issue. Each Party has the right to respond to any new or amended claim in accordance with Rule 9(c) or (d).

## Rule 11. Interpretation of Rules and Jurisdictional Challenges

(a) Once appointed, the Arbitrator shall resolve disputes about the interpretation and applicability of these Rules and conduct of the Arbitration Hearing. The resolution of the issue by the Arbitrator shall be final.

(b) Jurisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator. The Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter.

(c) Disputes concerning the appointment of the Arbitrator shall be resolved by JAMS.

(d) The Arbitrator may, upon a showing of good cause or *sua sponte*, when necessary to facilitate the Arbitration, extend any deadlines established in these Rules, provided that the time for rendering the Award may be altered only in accordance with Rules 22(i) or 24.

## Rule 12. Representation

(a) The Parties, whether natural persons or legal entities such as corporations, LLCs or partnerships, may be represented by counsel or any other person of the Party's choice. Each Party shall give prompt written notice to the Case Manager and the other Parties of the name, address, telephone number and email address of its representative. The representative of a Party may act on the Party's behalf in complying with these Rules.

(b) Changes in Representation. A Party shall give prompt written notice to the Case Manager and the other Parties of any change in its representation, including the name, address, telephone number and email address of the new representative. Such notice shall state that the written consent of the former representative, if any, and of the new representative, has been obtained and shall state the effective date of the new representation.

(c) The Arbitrator may withhold approval of any intended change or addition to a Party's legal representative(s) where such change or addition could compromise the ability of the Arbitrator to continue to serve, the composition of the Panel in the case of a tripartite Arbitration or the finality of any Award (on the grounds of possible conflict or other like impediment). In deciding whether to grant or withhold such approval, the Arbitrator shall have regard to the circumstances, including the general principle that a Party may be represented by a legal representative chosen by that Party, the stage that the Arbitration has reached, the potential prejudice resulting from the possible disqualification of the Arbitrator, the efficiency resulting from maintaining the composition of the Panel (as constituted throughout the Arbitration), the views of the other Party or Parties to the Arbitration and any likely wasted costs or loss of time resulting from such change or addition.

## Rule 13. Withdrawal from Arbitration

(a) No Party may terminate or withdraw from an Arbitration after the issuance of the Commencement Letter (see Rule 5), except by written agreement of all Parties to the Arbitration.

(b) A Party that asserts a claim or counterclaim may unilaterally withdraw that claim or counterclaim without prejudice by serving written notice on the other Parties and the Arbitrator. However, the opposing Parties may, within seven (7) calendar days of service of such notice, request that the Arbitrator condition the withdrawal upon such terms as he or she may direct.

## Rule 14. *Ex Parte* Communications

(a) No Party may have any *ex parte* communication with a neutral Arbitrator, except as provided in section (b) of this Rule. The Arbitrator(s) may authorize any Party to communicate directly with the Arbitrator(s) by email or other written means as long as copies are simultaneously forwarded to the JAMS Case Manager and the other Parties.

(b) A Party may have *ex parte* communication with its appointed neutral or non-neutral Arbitrator as necessary to secure the Arbitrator's services and to assure the absence of conflicts, as well as in connection with the selection of the Chairperson of the arbitral panel.

(c) The Parties may agree to permit more extensive *ex parte* communication between a Party and a non-neutral Arbitrator. More extensive communication with a non-neutral Arbitrator may also be permitted by applicable law and rules of ethics.

## Rule 15. Arbitrator Selection, Disclosures and Replacement

(a) Unless the Arbitrator has been previously selected by agreement of the Parties, JAMS may attempt to facilitate agreement among the Parties regarding selection of the Arbitrator.

(b) If the Parties do not agree on an Arbitrator, JAMS shall send the Parties a list of at least five (5) Arbitrator candidates in the case of a sole Arbitrator and at least ten (10) Arbitrator candidates in the case of a tripartite panel. JAMS shall also provide each Party with a brief description of the background and experience of each Arbitrator candidate. JAMS may add names to or replace any or all names on the list of Arbitrator candidates for reasonable cause at any time before the Parties have submitted their choice pursuant to subparagraph (c) below.

(c) Within seven (7) calendar days of service upon the Parties of the list of names, each Party may strike two (2) names in the case of a sole Arbitrator and three (3) names in the case of a tripartite panel, and shall rank the remaining Arbitrator candidates in order of preference. The remaining Arbitrator candidate with the highest composite ranking shall be appointed the Arbitrator. JAMS may grant a reasonable extension of the time to strike and rank the Arbitrator candidates to any Party without the consent of the other Parties.

(d) If this process does not yield an Arbitrator or a complete panel, JAMS shall designate the sole Arbitrator or as many members of the tripartite panel as are necessary to complete the panel.

(e) If a Party fails to respond to a list of Arbitrator candidates within seven (7) calendar days after its service, or fails to respond according to the instructions provided by JAMS, JAMS shall deem that Party to have accepted all of the Arbitrator candidates.

(f) Entities or individuals whose interests are not adverse with respect to the issues in dispute shall be treated as a single Party for purposes of the Arbitrator selection process. JAMS shall determine whether the interests between entities or individuals are adverse for purposes of Arbitrator selection, considering such factors as whether they are represented by the same attorney and whether they are presenting joint or separate positions at the Arbitration.

(g) If, for any reason, the Arbitrator who is selected is unable to fulfill the Arbitrator's duties, a successor Arbitrator shall be chosen in accordance with this Rule. If a member of a panel of Arbitrators becomes unable to fulfill his or her duties after the beginning of a Hearing but before the issuance of an Award, a new Arbitrator will be chosen in accordance with this Rule, unless, in the case of a tripartite panel, the Parties agree to proceed with the remaining two Arbitrators. JAMS will make the final determination as to whether an Arbitrator is unable to fulfill his or her duties, and that decision shall be final.

(h) Any disclosures regarding the selected Arbitrator shall be made as required by law or within ten (10) calendar days from the date of appointment. Such disclosures may be provided in electronic format, provided that JAMS will produce a hard copy to any Party that requests it. The Parties and their representatives shall disclose to JAMS any circumstance likely to give rise to justifiable doubt as to the Arbitrator's impartiality or independence, including any bias or any financial or personal interest in the result of the Arbitration or any past or present relationship with the Parties or their representatives. The obligation of the Arbitrator, the Parties and their representatives to make all required disclosures continues throughout the Arbitration process.

(i) At any time during the Arbitration process, a Party may challenge the continued service of an Arbitrator for cause. The challenge must be based upon information that was not available to the Parties at the time the Arbitrator was selected. A challenge for cause must be in writing and exchanged with opposing Parties, who may respond within seven (7) calendar days of service of the challenge. JAMS shall make the final determination as to such challenge. Such determination shall take into account the materiality of the facts and any prejudice to the Parties. That decision will be final.

(j) Where the Parties have agreed that a Party-appointed Arbitrator is to be non-neutral, that Party-appointed Arbitrator is not obliged to withdraw if requested to do so only by the Party that did not appoint that Arbitrator.

## Rule 16. Preliminary Conference

At the request of any Party or at the direction of the Arbitrator, a Preliminary Conference shall be conducted with the Parties or their counsel or representatives. The Preliminary Conference may address any or all of the following subjects:

(a) ¯  change of information in accordance with Rule 17 or otherwise;

(b) ¯.. chedule for discovery as permitted by the Rules, as agreed by the Parties or as required or authorized by applicable law;

(c) The pleadings of the Parties and any agreement to clarify or narrow the issues or structure the Arbitration Hearing;

(d) The scheduling of the Hearing and any pre-Hearing exchanges of information, exhibits, motions or briefs;

(e) The attendance of witnesses as contemplated by Rule 21;

(f) The scheduling of any dispositive motion pursuant to Rule 18;

(g) The premarking of exhibits, the preparation of joint exhibit lists and the resolution of the admissibility of exhibits;

(h) The form of the Award; and

(i) Such other matters as may be suggested by the Parties or the Arbitrator.

The Preliminary Conference may be conducted telephonically and may be resumed from time to time as warranted.

## Rule 16.1. Application of Expedited Procedures

(a) If these Expedited Procedures are referenced in the Parties' Agreement to arbitrate or are later agreed to by all Parties, they shall be applied by the Arbitrator.

(b) The Claimant or Respondent may opt into the Expedited Procedures. The Claimant may do so by indicating the election in the Demand for Arbitration. The Respondent may opt into the Expedited Procedures by so indicating in writing to JAMS with a copy to the Claimant served within fourteen (14) days of receipt of the Demand for Arbitration. If a Party opts into the Expedited Procedures, the other side shall indicate within seven (7) calendar days of notice thereof whether it agrees to the Expedited Procedures.

(c) If one Party elects the Expedited Procedures and any other Party declines to agree to the Expedited Procedures, each Party shall have a client or client representative present at the first Preliminary Conference (which should, if feasible, be an in-person conference), unless excused by the Arbitrator for good cause.

## Rule 16.2. Where Expedited Procedures Are Applicable

(a) The Arbitrator shall require compliance with Rule 17(a) prior to conducting the first Preliminary Conference. Each Party shall confirm in writing to the Arbitrator that it has so complied or shall indicate any limitations on full compliance and the reasons therefor.

(b) Document requests shall (1) be limited to documents that are directly relevant to the matters in dispute or to its outcome; (2) be reasonably restricted in terms of time frame, subject matter and persons or entities to which the requests pertain; and (3) not include broad phraseology such as "all documents directly or indirectly related to." The Requests shall not be encumbered with extensive "definitions" or "instructions." The Arbitrator may edit or limit the number of requests.

(c) E-discovery shall be limited as follows:

(i) There shall be production of electronic documents only from sources used in the ordinary course of business. Absent a showing of compelling need, no such documents are required to be produced from backup servers, tapes or other media.

(ii) Absent a showing of compelling need, the production of electronic documents shall normally be made on the basis of generally available technology in a searchable format that is usable by the requesting Party and convenient and economical for the producing Party. Absent a showing of compelling need, the Parties need not produce metadata, with the exception of header fields for email correspondence.

(iii) The description of custodians from whom electronic documents may be collected should be narrowly tailored to include only those individuals whose electronic documents may reasonably be expected to contain evidence that is material to the dispute.

(iv) Where the costs and burdens of e-discovery are disproportionate to the nature of the dispute or to the amount in controversy, or to the relevance of the materials requested, the Arbitrator may either deny such requests or order disclosure on the condition that the requesting Party advance the reasonable cost of production to the other side, subject to the allocation of costs in the final Award.

(v) The Arbitrator may vary these Rules after discussion with the Parties at the Preliminary Conference.

(d) Depositions of percipient witnesses shall be limited as follows:

(i) The limitation of one discovery deposition per side (Rule 17(b)) shall be applied by the Arbitrator, unless it is determined, based on all relevant circumstances, that more depositions are warranted. The Arbitrator shall consider the amount in controversy, the complexity of the factual issues, the number of Parties and the diversity of their interests, and whether any or all of the claims appear, on the basis of the pleadings, to have sufficient merit to justify the time and expense associated with the requested discovery.

(ii) The Arbitrator shall also consider the additional factors listed in the JAMS Recommended Arbitration Discovery Protocols for Domestic Commercial Cases.

(e) Expert depositions, if any, shall be limited as follows: Where written expert reports are produced to the other side in advance of the Hearing, expert depositions may be conducted only by agreement of the Parties or by order of the Arbitrator for good cause shown.

(f) Discovery disputes shall be resolved on an expedited basis.

(i) Where there is a panel of three Arbitrators, the Parties are encouraged to agree, by rule or otherwise, that the Chair or another member of the panel be authorized to resolve discovery issues, acting alone.

(ii) Lengthy briefs on discovery matters should be avoided. In most cases, the submission of brief letters will sufficiently inform the Arbitrator with regard to the issues to be decided.

(iii) The Parties should meet and confer in good faith prior to presenting any issues for the Arbitrator's decision.

(iv) If disputes exist with respect to some issues, that should not delay the Parties' discovery on remaining issues.

(g) The Arbitrator shall set a discovery cutoff not to exceed seventy-five (75) calendar days after the Preliminary Conference for percipient discovery and not to exceed one hundred five (105) calendar days for expert discovery (if any). These dates may be extended by the Arbitrator for good cause shown.

(h) Dispositive motions (Rule 18) shall not be permitted, except as set forth in the JAMS Recommended Arbitration Discovery Protocols for Domestic Commercial Cases or unless the Parties agree to that procedure.

(i) The Hearing shall commence within sixty (60) calendar days after the cutoff for percipient discovery. Consecutive Hearing days shall be established unless otherwise agreed by the Parties or ordered by the Arbitrator. These dates may be extended by the Arbitrator for good cause shown.

(j) The Arbitrator may alter any of these Procedures for good cause.

## Rule 17. Exchange of Information

(a) The Parties shall cooperate in good faith in the voluntary and informal exchange of all non-privileged documents and other information (including electronically stored information ("ESI")) relevant to the dispute or claim immediately after commencement of the Arbitration. They shall complete an initial exchange of all relevant, non-privileged documents, including, without limitation, copies of all documents in their possession or control on which they rely in support of their positions, and names of individuals whom they may call as witnesses at the Arbitration Hearing, within twenty-one (21) calendar days after all pleadings or notice of claims have been received. The Arbitrator may modify these obligations at the Preliminary Conference.

(b) Each Party may take one deposition of an opposing Party or of one individual under the control of the opposing Party. The Parties shall attempt to agree on the time, location and duration of the deposition. If the Parties do not agree, these issues shall be determined by the Arbitrator. The necessity of additional depositions shall be determined by the Arbitrator based upon the reasonable need for the requested information, the availability of other discovery options and the burdensomeness of the request on the opposing Parties and the witness.

(c) As they become aware of new documents or information, including experts who may be called upon to testify, all Parties continue to be obligated to provide relevant, non-privileged documents to supplement their identification of witnesses and experts and to honor any informal agreements or understandings between the Parties regarding documents or information to be exchanged. Documents that were not previously exchanged, or witnesses and experts that were not previously identified, may not be considered by the Arbitrator at the Hearing, unless agreed by the Parties or upon a showing of good cause.

(d) The Parties shall promptly notify JAMS when a dispute exists regarding discovery issues. A conference shall be arranged with the Arbitrator, either by telephone or in person, and the Arbitrator shall decide the dispute. With the written consent of all Parties, and in accordance with an agreed written procedure, the Arbitrator may appoint a special master to assist in resolving a discovery dispute.

(e) In a consumer or employment case, the Parties may take discovery of third parties with the approval of the Arbitrator.

## Rule 18. Summary Disposition of a Claim or Issue

The Arbitrator may permit any Party to file a Motion for Summary Disposition of a particular claim or issue, either by agreement of all interested Parties or at the request of one Party, provided other interested Parties have reasonable notice to respond to the request. The Request may be granted only if the Arbitrator determines that the requesting Party has shown that the proposed motion is likely to succeed and dispose of or narrow the issues in the case.

## Rule 19. Scheduling and Location of Hearing

(a) The Arbitrator, after consulting with the Parties that have appeared, shall determine the date, time and location of the Hearing. The Arbitrator and the Parties shall attempt to schedule consecutive Hearing days if more than one day is necessary.

(b) If a Party has failed to participate in the Arbitration process, and the Arbitrator reasonably believes that the Party will not participate in the Hearing, the Arbitrator may set the Hearing without consulting with that Party. The non-participating Party shall be served with a Notice of Hearing at least thirty (30) calendar days prior to the scheduled date, unless the law of the relevant jurisdiction allows for, or the Parties have agreed to, shorter notice.

(c) The Arbitrator, in order to hear a third-party witness, or for the convenience of the Parties or the witnesses, may conduct the Hearing at any location. Any JAMS Resolution Center may be designated a Hearing location for purposes of the issuance of a subpoena or subpoena *duces tecum* to a third-party witness.

## Rule 20. Pre-Hearing Submissions

(a) Except as set forth in any scheduling order that may be adopted, at least fourteen (14) calendar days before the Arbitration Hearing, the Parties shall file with JAMS and serve and exchange (1) a list of the witnesses they intend to call, including any experts; (2) a short description of the anticipated testimony of each such witness and an estimate of the length of the witness' direct testimony; (3) any written expert reports that may be introduced at the Arbitration Hearing; and (4) a list of all exhibits intended to be used at the Hearing. The Parties should exchange with each other copies of any such exhibits to the extent that they have not been previously exchanged. The Parties should pre-mark exhibits and shall attempt to resolve any disputes regarding the admissibility of exhibits prior to the Hearing.

(b) The Arbitrator may require that each Party submit a concise written statement of position, including summaries of the facts and evidence a Party intends to present, discussion of the applicable law and the basis for the requested Award or denial of relief sought. The statements, which may be in the form of a letter, shall be filed with JAMS and served upon the other Parties at least seven (7) calendar days before the Hearing date. Rebuttal statements or other pre-Hearing written submissions may be permitted or required at the discretion of the Arbitrator.

## Rule 21. Securing Witnesses and Documents for the Arbitration Hearing

At the written request of a Party, all other Parties shall produce for the Arbitration Hearing all specified witnesses in their employ or under their control without need of subpoena. The Arbitrator may issue subpoenas for the attendance of witnesses or the production of documents either prior to or at the Hearing pursuant to this Rule or Rule 19(c). The subpoena or subpoena *duces tecum* shall be issued in accordance with the applicable law. Pre-issued subpoenas may be used in jurisdictions that permit them. In the event a Party or a subpoenaed person objects to the production of a witness or other evidence, the Party or subpoenaed person may file an objection with the Arbitrator, who shall promptly rule on the objection, weighing both the burden on the producing Party and witness and the need of the proponent for the witness or other evidence.

## Rule 22. The Arbitration Hearing

(a) The Arbitrator will ordinarily conduct the Arbitration Hearing in the manner set forth in these Rules. The Arbitrator may vary these procedures if it is determined to be reasonable and appropriate to do so.

(b) The Arbitrator shall determine the order of proof, which will generally be similar to that of a court trial.

(c) The Arbitrator shall require witnesses to testify under oath if requested by any Party, or otherwise at the discretion of the Arbitrator.

(d) Strict conformity to the rules of evidence is not required, except that the Arbitrator shall apply applicable law relating to privileges and work product. The Arbitrator shall consider evidence that he or she finds relevant and material to the dispute, giving the evidence such weight as is appropriate. The Arbitrator may be guided in that determination by principles contained in the Federal Rules of Evidence or any other applicable rules of evidence. The Arbitrator may limit testimony to exclude evidence that would be immaterial or unduly repetitive, provided that all Parties are afforded the opportunity to present material and relevant evidence.

(e) The Arbitrator shall receive and consider relevant deposition testimony recorded by transcript or videotape, provided that the other Parties have had the opportunity to attend and cross-examine. The Arbitrator may in his or her discretion consider witness affidavits or other recorded testimony even if the other Parties have not had the opportunity to cross-examine, but will give that evidence only such weight as he or she deems appropriate.

(f) The Parties will not offer as evidence, and the Arbitrator shall neither admit into the record nor consider, prior settlement offers by the Parties or statements or recommendations made by a mediator or other person in connection with efforts to resolve the dispute being arbitrated, except to the extent that applicable law permits the admission of such

evidence.

(g) The Arbitrator has full authority to determine that the Hearing, or any portion thereof, be conducted in person or virtually by conference call, videoconference or using other communications technology with participants in one or more geographical places, or in a combined form. If some or all of the witnesses or other participants are located remotely, the Arbitrator may make such orders and set such procedures as the Arbitrator deems necessary or advisable.

(h) When the Arbitrator determines that all relevant and material evidence and arguments have been presented, and any interim or partial Awards have been issued, the Arbitrator shall declare the Hearing closed. The Arbitrator may defer the closing of the Hearing until a date determined by the Arbitrator in order to permit the Parties to submit post-Hearing briefs, which may be in the form of a letter, and/or to make closing arguments. If post-Hearing briefs are to be submitted or closing arguments are to be made, the Hearing shall be deemed closed upon receipt by the Arbitrator of such briefs or at the conclusion of such closing arguments, whichever is later.

(i) At any time before the Award is rendered, the Arbitrator may, *sua sponte* or on application of a Party for good cause shown, reopen the Hearing. If the Hearing is reopened, the time to render the Award shall be calculated from the date the reopened Hearing is declared closed by the Arbitrator.

(j) The Arbitrator may proceed with the Hearing in the absence of a Party that, after receiving notice of the Hearing pursuant to Rule 19, fails to attend. The Arbitrator may not render an Award solely on the basis of the default or absence of the Party, but shall require any Party seeking relief to submit such evidence as the Arbitrator may require for the rendering of an Award. If the Arbitrator reasonably believes that a Party will not attend the Hearing, the Arbitrator may schedule the Hearing as a telephonic Hearing and may receive the evidence necessary to render an Award by affidavit. The notice of Hearing shall specify if it will be in person or telephonic.

(k) Any Party may arrange for a stenographic record to be made of the Hearing and shall inform the other Parties in advance of the Hearing. No other means of recording the proceedings shall be permitted absent agreement of the Parties or by direction of the Arbitrator.

(i) The requesting Party shall bear the cost of such stenographic record. If all other Parties agree to share the cost of the stenographic record, it shall be made available to the Arbitrator and may be used in the proceeding.

(ii) If there is no agreement to share the cost of the stenographic record, it may not be provided to the Arbitrator and may not be used in the proceeding, unless the Party arranging for the stenographic record agrees to provide access to the stenographic record either at no charge or on terms that are acceptable to the Parties and the reporting service.

(iii) If the Parties agree to the Optional Arbitration Appeal Procedure (Rule 34), they shall, if possible, ensure that a stenographic or other record is made of the Hearing and shall share the cost of that record.

(iv) The Parties may agree that the cost of the stenographic record shall or shall not be allocated by the Arbitrator in the Award.

## Rule 23. Waiver of Hearing

The Parties may agree to waive the oral Hearing and submit the dispute to the Arbitrator for an Award based on written submissions and other evidence as the Parties may agree.

## Rule 24. Awards

(a) The Arbitrator shall render a Final Award or a Partial Final Award within thirty (30) calendar days after the date of the close of the Hearing, as defined in Rule 22(h) or (i), or, if a Hearing has been waived, within thirty (30) calendar days after the receipt by the Arbitrator of all materials specified by the Parties, except (1) by the agreement of the Parties; (2) upon good cause for an extension of time to render the Award; or (3) as provided in Rule 22(i). The Arbitrator shall provide the Final Award or the Partial Final Award to JAMS for issuance in accordance with this Rule.

(b) Where a panel of Arbitrators has heard the dispute, the decision and Award of a majority of the panel shall constitute the Arbitration Award.

(c) In determining the merits of the dispute, the Arbitrator shall be guided by the rules of law agreed upon by the Parties. In the absence of such agreement, the Arbitrator shall be guided by the rules of law and equity that he or she deems to be most appropriate. The Arbitrator may grant any remedy or relief that is just and equitable and within the scope of the Parties' Agreement, including, but not limited to, specific performance of a contract or any other equitable or legal remedy.

(d) In addition to a Final Award or Partial Final Award, the Arbitrator may make other decisions, including interim or partial rulings, orders and Awards.

(e) Interim Measures. The Arbitrator may grant whatever interim measures are deemed necessary, including injunctive relief and measures for the protection or conservation of property and disposition of disposable goods. Such interim

measures may take the form of an interim or Partial Final Award, and the Arbitrator may require security for the costs of such measures. Any recourse by a Party to a court for interim or provisional relief shall not be deemed incompatible with the agreement to arbitrate or a waiver of the right to arbitrate.

(f) The Award of the Arbitrator may allocate Arbitration fees and Arbitrator compensation and expenses, unless such an allocation is expressly prohibited by the Parties' Agreement. (Such a prohibition may not limit the power of the Arbitrator to allocate Arbitration fees and Arbitrator compensation and expenses pursuant to Rule 31(c).)

(g) The Award of the Arbitrator may allocate attorneys' fees and expenses and interest (at such rate and from such date as the Arbitrator may deem appropriate) if provided by the Parties' Agreement or allowed by applicable law. When the Arbitrator is authorized to award attorneys' fees and must determine the reasonable amount of such fees, he or she may consider whether the failure of a Party to cooperate reasonably in the discovery process and/or comply with the Arbitrator's discovery orders caused delay to the proceeding or additional costs to the other Parties.

(h) The Award shall consist of a written statement signed by the Arbitrator regarding the disposition of each claim and the relief, if any, as to each claim. Unless all Parties agree otherwise, the Award shall also contain a concise written statement of the reasons for the Award.

(i) After the Award has been rendered, and provided the Parties have complied with Rule 31, the Award shall be issued by serving copies on the Parties. Service may be made by U.S. mail. It need not be sent certified or registered.

(j) Within seven (7) calendar days after service of a Partial Final Award or Final Award by JAMS, any Party may serve upon the other Parties and file with JAMS a request that the Arbitrator correct any computational, typographical or other similar error in an Award (including the reallocation of fees pursuant to Rule 31(c) or on account of the effect of an offer to allow judgment), or the Arbitrator may *sua sponte* propose to correct such errors in an Award. A Party opposing such correction shall have seven (7) calendar days thereafter in which to file and serve any objection. The Arbitrator may make any necessary and appropriate corrections to the Award within twenty-one (21) calendar days of receiving a request or fourteen (14) calendar days after his or her proposal to do so. The Arbitrator may extend the time within which to make corrections upon good cause. The corrected Award shall be served upon the Parties in the same manner as the Award.

(k) The Award is considered final, for purposes of either the Optional Arbitration Appeal Procedure pursuant to Rule 34 or a judicial proceeding to enforce, modify or vacate the Award pursuant to Rule 25, fourteen (14) calendar days after service if no request for a correction is made, or as of the effective date of service of a corrected Award.

## Rule 25. Enforcement of the Award

Proceedings to enforce, confirm, modify or vacate an Award will be controlled by and conducted in conformity with the Federal Arbitration Act, 9 U.S.C. Sec 1, *et seq.*, or applicable state law. The Parties to an Arbitration under these Rules shall be deemed to have consented that judgment upon the Award may be entered in any court having jurisdiction thereof.

## Rule 26. Confidentiality and Privacy

(a) JAMS and the Arbitrator shall maintain the confidential nature of the Arbitration proceeding and the Award, including the Hearing, except as necessary in connection with a judicial challenge to or enforcement of an Award, or unless otherwise required by law or judicial decision.

(b) The Arbitrator may issue orders to protect the confidentiality of proprietary information, trade secrets or other sensitive information.

(c) Subject to the discretion of the Arbitrator or agreement of the Parties, any person having a direct interest in the Arbitration may attend the Arbitration Hearing. The Arbitrator may exclude any non-Party from any part of a Hearing.

## Rule 27. Waiver

(a) If a Party becomes aware of a violation of or failure to comply with these Rules and fails promptly to object in writing, the objection will be deemed waived, unless the Arbitrator determines that waiver will cause substantial injustice or hardship.

(b) If any Party becomes aware of information that could be the basis of a challenge for cause to the continued service of the A      rator, such challenge must be made promptly, in writing, to the Arbitrator or JAMS. Failure to do so shall con        a waiver of any objection to continued service by the Arbitrator.

## Rule 28. Settlement and Consent Award

(a) The Parties may agree, at any stage of the Arbitration process, to submit the case to JAMS for mediation. The JAMS mediator assigned to the case may not be the Arbitrator or a member of the Appeal Panel, unless the Parties so agree, pursuant to Rule 28(b).

(b) The Parties may agree to seek the assistance of the Arbitrator in reaching settlement. By their written agreement to submit the matter to the Arbitrator for settlement assistance, the Parties will be deemed to have agreed that the assistance of the Arbitrator in such settlement efforts will not disqualify the Arbitrator from continuing to serve as Arbitrator if settlement is not reached; nor shall such assistance be argued to a reviewing court as the basis for vacating or modifying an Award.

(c) If, at any stage of the Arbitration process, all Parties agree upon a settlement of the issues in dispute and request the Arbitrator to embody the agreement in a Consent Award, the Arbitrator shall comply with such request, unless the Arbitrator believes the terms of the agreement are illegal or undermine the integrity of the Arbitration process. If the Arbitrator is concerned about the possible consequences of the proposed Consent Award, he or she shall inform the Parties of that concern and may request additional specific information from the Parties regarding the proposed Consent Award. The Arbitrator may refuse to enter the proposed Consent Award and may withdraw from the case.

## Rule 29. Sanctions

The Arbitrator may order appropriate sanctions for failure of a Party to comply with its obligations under any of these Rules or with an order of the Arbitrator. These sanctions may include, but are not limited to, assessment of Arbitration fees and Arbitrator compensation and expenses; assessment of any other costs occasioned by the actionable conduct, including reasonable attorneys' fees; exclusion of certain evidence; drawing adverse inferences; or, in extreme cases, determining an issue or issues submitted to Arbitration adversely to the Party that has failed to comply.

## Rule 30. Disqualification of the Arbitrator as a Witness or Party and Exclusion of Liability

(a) The Parties may not call the Arbitrator, the Case Manager or any other JAMS employee or agent as a witness or as an expert in any pending or subsequent litigation or other proceeding involving the Parties and relating to the dispute that is the subject of the Arbitration. The Arbitrator, Case Manager and other JAMS employees and agents are also incompetent to testify as witnesses or experts in any such proceeding.

(b) The Parties shall defend and/or pay the cost (including any attorneys' fees) of defending the Arbitrator, Case Manager and/or JAMS from any subpoenas from outside parties arising from the Arbitration.

(c) The Parties agree that neither the Arbitrator, nor the Case Manager, nor JAMS is a necessary Party in any litigation or other proceeding relating to the Arbitration or the subject matter of the Arbitration, and neither the Arbitrator, nor the Case Manager, nor JAMS, including its employees or agents, shall be liable to any Party for any act or omission in connection with any Arbitration conducted under these Rules, including, but not limited to, any disqualification of or recusal by the Arbitrator.

## Rule 31. Fees

(a) Each Party shall pay its *pro rata* share of JAMS fees and expenses as set forth in the JAMS fee schedule in effect at the time of the commencement of the Arbitration, unless the Parties agree on a different allocation of fees and expenses. JAMS' agreement to render services is jointly with the Party and the attorney or other representative of the Party in the Arbitration. The non-payment of fees may result in an administrative suspension of the case in accordance with Rule 6(c).

(b) JAMS requires that the Parties deposit the fees and expenses for the Arbitration from time to time during the course of the proceedings and prior to the Hearing. The Arbitrator may preclude a Party that has failed to deposit its *pro rata* or agreed-upon share of the fees and expenses from offering evidence of any affirmative claim at the Hearing.

(c) The Parties are jointly and severally liable for the payment of JAMS Arbitration fees and Arbitrator compensation and expenses. In the event that one Party has paid more than its share of such fees, compensation and expenses, the Arbitrator may award against any other Party any such fees, compensation and expenses that such Party owes with respect to the Arbitration.

(d) Entities or individuals whose interests are not adverse with respect to the issues in dispute shall be treated as a single Party for purposes of JAMS' assessment of fees. JAMS shall determine whether the interests between entities or indi     s are adverse for purpose of fees, considering such factors as whether the entities or individuals are represented by t    he attorney and whether the entities or individuals are presenting joint or separate positions at the Arbitration.

## Rule 32. Bracketed (or High-Low) Arbitration Option

(a) At any time before the issuance of the Arbitration Award, the Parties may agree, in writing, on minimum and maximum amounts of damages that may be awarded on each claim or on all claims in the aggregate. The Parties shall promptly notify JAMS and provide to JAMS a copy of their written agreement setting forth the agreed-upon minimum and maximum amounts.

(b) JAMS shall not inform the Arbitrator of the agreement to proceed with this option or of the agreed-upon minimum and maximum levels without the consent of the Parties.

(c) The Arbitrator shall render the Award in accordance with Rule 24.

(d) In the event that the Award of the Arbitrator is between the agreed-upon minimum and maximum amounts, the Award shall become final as is. In the event that the Award is below the agreed-upon minimum amount, the final Award issued shall be corrected to reflect the agreed-upon minimum amount. In the event that the Award is above the agreed-upon maximum amount, the final Award issued shall be corrected to reflect the agreed-upon maximum amount.

## Rule 33. Final Offer (or Baseball) Arbitration Option

(a) Upon agreement of the Parties to use the option set forth in this Rule, at least seven (7) calendar days before the Arbitration Hearing, the Parties shall exchange and provide to JAMS written proposals for the amount of money damages they would offer or demand, as applicable, and that they believe to be appropriate based on the standard set forth in Rule 24(c). JAMS shall promptly provide copies of the Parties' proposals to the Arbitrator, unless the Parties agree that they should not be provided to the Arbitrator. At any time prior to the close of the Arbitration Hearing, the Parties may exchange revised written proposals or demands, which shall supersede all prior proposals. The revised written proposals shall be provided to JAMS, which shall promptly provide them to the Arbitrator, unless the Parties agree otherwise.

(b) If the Arbitrator has been informed of the written proposals, in rendering the Award, the Arbitrator shall choose between the Parties' last proposals, selecting the proposal that the Arbitrator finds most reasonable and appropriate in light of the standard set forth in Rule 24(c). This provision modifies Rule 24(h) in that no written statement of reasons shall accompany the Award.

(c) If the Arbitrator has not been informed of the written proposals, the Arbitrator shall render the Award as if pursuant to Rule 24, except that the Award shall thereafter be corrected to conform to the closest of the last proposals and the closest of the last proposals will become the Award.

(d) Other than as provided herein, the provisions of Rule 24 shall be applicable.

## Rule 34. Optional Arbitration Appeal Procedure

The Parties may agree at any time to the JAMS Optional Arbitration Appeal Procedure. All Parties must agree in writing for such procedure to be effective. Once a Party has agreed to the Optional Arbitration Appeal Procedure, it cannot unilaterally withdraw from it, unless it withdraws, pursuant to Rule 13, from the Arbitration.

## Local Solutions. Global Reach. ™

JAMS successfully resolves business and legal disputes by providing efficient, cost-effective and impartial ways of overcoming barriers at any stage of conflict. JAMS offers customized, in-person, virtual and hybrid dispute resolution services through a combination of first class client service, the latest technology, top-notch facilities, and highly trained mediators and arbitrators.

## Fees & Costs

- **Arbitration Schedule of Fees & Costs ›**

*NOTICE:* These Rules are the copyrighted property of JAMS. They cannot be copied, reprinted or used in any way without permission of JAMS, unless they are being used by the parties to an arbitration as the rules for that arbitration. If they are being used as the rules for an arbitration, proper attribution must be given to JAMS. If you wish to obtain permission to use our copyrighted materials, please contact JAMS at 949-224-1810.